Edwin A. WELLS, d/b/a Wells Electrical Construction Co., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 16373.

United States Court of Appeals Sixth Circuit.

June 10, 1966.

Morton M. Stotter, Cleveland, Ohio, for petitioner, Raymond D. Metzner, Cleveland, Ohio, on the brief.

George H. Cohen, National Labor Relations Board, Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Paul M. Thompson, Attys., National Labor Relations Board, Washington, D. C., on the brief.

Before PHILLIPS and EDWARDS, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

This cause is before the Court on petition of Edwin A. Wells, d/b/a Wells Electrical Construction Company (hereinafter referred to as Wells), to review and set aside an order of the National Labor Relations Board (hereinafter called the Board) issued August 31, 1964. Wells caused a complaint to be issued against Local 38, International Brotherhood of Electrical Workers, AFL-CIO (hereinafter called the Union) for alleged violation of the secondary boycott provisions of Section 8(b) (4) (i) and (ii) (B) [1] (Section 158, Title 29, U.S.C.) of the National Labor Relations Act (referred to herein as the Act).

The Trial Examiner found the Union in violation of the Act, as alleged, and recommended an appropriate remedy. A

---

1. "(b) It shall be an unfair labor practice for a labor organization or its agents—

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * * "

three member panel of the Board reversed the Trial Examiner and ordered the complaint dismissed. One member of the Board, dissenting, would have affirmed the Trial Examiner's finding that the Union violated Section 8(b) (4) (ii) (B) of the Act. The decision of the Board, together with the Examiner's findings, conclusions and recommendations, are reported at 148 NLRB 757. The Court has jurisdiction of this review under Section 10(f) (Section 160(f), Title 29, U.S.C.) of the Act.

The facts are stated in detail in the findings of the Trial Examiner. The setting, out of which these unfair labor charges arose, may be stated as follows: The Herb Jones Construction Company was the general contractor for the Millwood Estates Project located in the Cleveland area. Construction of homes was begun on this project in January, 1962. It was contemplated that approximately two hundred homes would ultimately be built in this project. At the time with which we are here concerned, the general contractor, whom we will refer to as Herb Jones, had three subcontractors working at Millwood on the houses then under construction. Wells was the electrical contractor and neither he nor his employees were members of the Union. Charles Jones, a brother of Herb Jones, was the masonry contractor and Mike Galan had the carpentry contract. Charles Jones and Galan and all of their employees were members of their respective unions.

The facts which led to the unfair labor charge may be summarized as follows: In March of 1962, Edward J. Becka, business agent for Local 38, International Brotherhood of Electrical Workers, AFL-CIO, began a campaign to get Herb Jones to get rid of Wells because he was not a union contractor. He contacted Jones on several occasions between March, 1962 and May 7, 1963. In the meantime both Wells and Herb Jones tried to have Wells become affiliated with the Union. Each time Wells met with the decision, "Not recommended at this time." Finally, Becka told Herb Jones that Wells had at one time been fined by the Union and had been expelled from the Electrical Union. This was either clearly false or was a case of mistaken identity as Wells had never been a member of the Union. It appears that another Wells had been so expelled. Although Becka became aware that the Wells here involved had never been expelled from the Union, the Union refused to take favorable action on Wells' application for membership.

On the morning of May 7, 1963, a regular meeting of representatives of building trade unions was held at the Cleveland Building Trade Council. The matter of a non-union electrical contractor working at Millwood Estates was discussed. Martin Graham of the Bricklayers Union and Lewis Fusile of the Carpenters Union were present at the meeting. About 10:30 A.M. of the same day, Becka and Fusile met Herb Jones at the entrance to Millwood Estates. Becka told Jones that this business of having Wells, a non-union electrical worker working on the job with other union men, would have to come to a stop. On being asked what would happen if Jones did not accede to Becka's demands, Becka said, "Don't act like a school kid. You know what I am talking about."

On the afternoon of May 7th, Fusile and Becka approached Galan, the carpenter subcontractor. They referred to the non-union electrician on the job and said they would have to stop the job some day if Jones didn't hire union electricians. The following day, May 8th, Galan took his carpenters to the Valley Road job. Carnauch, one of Galan's men, came to the Millwood job on the 8th and Fusile told him the "job is stopped" because Herb Jones had a non-union electrician. Carnauch had not worked at Millwood the day before and did not know that Galan had gone to Valley Road. Fusile directed Carnauch to report to Galan at Valley Road. Fusile went to Galan's new jobsite and told Galan not to go back to Millwood until everything was settled because the job was stopped there.

At about 8 o'clock on the morning of May 9, Becka, Fusile and Graham congregated at the entrance of the Millwood Estates. Graham came to Charles Jones and said, "You know what this is all about, that we are going to have to stop the job." Graham told Jones to take his men to another job and he said, "Do you want to tell them or shall I tell them?" Jones said he would tell them. He then told his men that they couldn't work there because there was a non-union electrician.

About 9 A.M. on the 9th, Herb Jones gave up and solicited bids from union electrical subcontractors. At 11 A.M. he notified Wells that he could not continue the job with him as electrical contractor. By 7:00 P.M. Herb Jones signed a contract with Forest City Electric, a subcontractor acceptable to the Union. That same evening Herb Jones called Charles Jones and Galan to tell them that he had signed up with a union contractor and for them to notify the unions. On May 10th at about 9:30 A.M., Fusile personally visited Galan and told him that everything was settled and that they could go back to work. The subcontractors with their men then returned to the Millwood Estates job.

There is ample evidence in the record of the hearing before the Trial Examiner to show that Becka in collaboration with Graham and Fusile effectively stopped the work at Millwood Estates and forced Herb Jones to cancel his contract with Wells. The question is whether the conduct of these men in accomplishing their purpose constituted a violation of Section 8(b) (4) (i) and (ii) (B) of the Act. The Trial Examiner concluded,

"4. By inducing and encouraging individuals employed by Galan and Charles Jones to engage in a strike or a refusal in the course of their employment to perform services, and thereby coercing and restraining the foregoing employers with an object of (1) forcing or requiring them to cease doing business with Herb Jones Construction Company, and (2) forcing Herb Jones Construction Company to cease doing business with Edwin A. Wells d.b.a. E. Wells Electrical Construction Company, the Respondent has violated Section 8(b) (4) (i) and (ii) (B) of the Act." (148 NLRB 789)

The Board did not disagree with the Examiner's finding of facts, but it placed a different interpretation upon them. The points of difference can be shown by reference to the Board's decision. (148 NLRB 757)

The Trial Examiner found that since Fusile and Graham had agreed at the Council meeting to aid the Union in its efforts to remove Wells from the Millwood Estates job, they acted as agents of the Union in assisting in the accomplishment of that agreement. For the purpose of its decision, the Board assumes this finding to be correct.

The Trial Examiner found that conduct of Fusile and Graham constituted violations of Section 8(b) (4) (i) in the following respects:

"(a) On May 8, 1963, business agent Fusile told Alex Carnauch, an employee of Galan, that Carnauch was to join Galan's crew which was working that day at another jobsite and that the job at Millwood Estates was 'stopped'.

"(b) On May 9, business agent Graham told Charles Jones that the job would have to be stopped and, 'Do you want to tell them (Charles Jones' employees) or should I tell them?' Charles Jones replied that he would tell his employees and did so."

The Board disagrees with the Examiner on both of these findings.

■■■ As to (a) the Board takes the view that Galan moved his crew to a different job on May 8th because of a lack of material; that Carnauch had come to the Millwood job by mistake, (he had not worked at Millwood on the 7th); that it was in fact true that the job was stopped as to Galan, since he had moved to another job because of shortage of material; and that Fusile directed him to return to work rather than attempting to induce him to cease

work. We think this is a reasonable interpretation of the evidence and within our scope of review[2] we cannot say the Board is in error.

As to (b) the Examiner found that Charles Jones, by relaying Graham's instructions to his employees, was acting as Graham's agent; and therefore, that Jones' statement to his employees that they were not to work at Millwood Estates constituted an inducement by the Union of Charles Jones' employees to refuse to work in violation of Section 8(b) (4) (i) of the Act. The Board took the view that Graham's statement to Jones did not in itself constitute an inducement of Jones' employees not to perform services within the meaning of Section 8(b) (4) (i). Since Charles Jones was an employer the appeal called for managerial discretion and therefore Jones decided in his managerial capacity to take his men to another job. We cannot agree with the Board in this interpretation of the facts.

The Examiner cited National Labor Relations Board v. Local 1976, United Broth. etc. (Sand Door & Plywood Co.), 241 F.2d 147, C.A. 9, aff. 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 as authority to support his finding that the Union, through Graham, was responsible for Charles Jones' statement to his employees. The Board attempts to distinguish this case from the one now before us. We do not consider the distinction to be valid.

In *Sand Door*, supra, Nathan Fleisher, business agent of Local 1976, told Arnold Steinert, carpenter foreman of Havstad & Jensen, that he would have to stop hanging doors of Sand Door & Plymouth Co. for Havstad & Jensen because they were not union manufactured. Steinert carried out the instruction and stopped his men from working with the Sand doors. Local 1976 had no labor dispute with contractors Havstad & Jensen. Unfair labor charges were filed against Local 1976.

In answer to the Union's argument that Steinert "acted solely as a representative of management when he instructed employees to cease their work on the doors," the Court said, 241 F.2d at p. 156,

"Steinert was a member of Local 563 of the Union. The By-Laws and Trade Rules of the Los Angeles County District Council of Carpenters required that he belong to the Union, and that he should hire no non-union members. As foremen, he and the steward were 'equally responsible for the enforcement of all By-Laws and Trade Rules,' etc. Violators of that rule were 'subject to a fine of $100.00 and/or expulsion'.

"Therefore, when Fleisher ordered Steinert to stop work on the doors because they were non-union, it is logical to assume that he was invoking Steinert's obligations under the Union's rules."

2. "We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less susbtantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case. To give it this significance does not seem to us materially more difficult than to heed the other factors which in sum determine whether evidence is 'substantial'." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 496–497, 71 S.Ct. 456, 469, 95 L.Ed. 456.

See also Boeing Airplane Co. v. National Labor Relations Board, 217 F.2d 369, 375, C.A. 9; National Labor Relations Board v. Continental Baking Co., 221 F.2d 427, 433, 436, C.A. 8; Pittsburgh-Des Moines Steel Company v. N.L.R.B., 284 F.2d 74, 88, C.A. 9.

See also United Brotherhood of Carpenters, Etc. v. N.L.R.B., 109 U.S. App.D.C. 249, 286 F.2d 533, 536; Sheet Metal Workers' International Ass'n, AFL-CIO v. N.L.R.B., 110 U.S.App.D.C. 302, 293 F.2d 141, 144, cert. den. 368 U.S. 896, 82 S.Ct. 172, 7 L.Ed.2d 92. Although Charles Jones was an employer, he was also a member of the Bricklayers Union and was subject to its discipline. When Graham, in effect, said, "Shall I tell them or will you tell them," Jones had no alternative. The meaning of Graham was obvious and Jones understood just what he meant. It is reasonable and logical to assume that Jones was acting under his obligation to the Bricklayers Union when he took his men off of the job. Particularly is this true in view of Graham's threat. Considering the avowed purpose of the union representatives and the circumstances surrounding the Millwood project, this was clearly a message from Graham to Jones' employees. The substantial evidence and the reasonable inferences to be drawn therefrom support the finding of the Examiner.

■ The Examiner found three acts of conduct on the part of Becka, Fusile and Graham to constitute threats in violation of Section 8(b) (4) (ii) (B).

"(1) On May 7, 1963, Becka, Respondent's (the Union) business agent asked Herb Jones to replace Wells with a union contractor. Jones refused. Later in the conversation, Jones asked Becka what would happen if he continued to refuse to replace Wells. Becka replied, according to the credited account of Jones, 'I would have to find out for myself.' When Jones repeated his question, Becka answered, 'Just don't act like a school kid. You know what I'm talking about.'

"(2) As described above, on May 8, 1963, Galan, the carpentry contractor, left the Millwood Estates site because there was insufficient material to continue working. Fusile, the Carpenters' business agent, then went to the other jobsite and told Galan that '* * * we should stay here, not to go on the Millwood Estates until every-thing is settled, the job is stopped there.'

"(3) On May 9, 1963, Graham, business agent for the Bricklayers, spoke to Charles Jones at the jobsite, and said, '* * * we are going to have to stop the job.' Graham asked Jones if he had some other place where the men could work. Jones answered in the affirmative. Graham then suggested, 'Well, why don't you take them over there and then they won't lose any time? * * * Do you want to tell them or should I tell them?' Jones replied that he would tell his men." (148 NLRB 759–60)

The Board attached no significance to these alleged threats. It took the view that the statements above quoted did not reach the level of threats, coercion or restraint prohibited by Section 8(b) (4) (ii).

As to 1, the Board considered that Becka's reply to Herb Jones, was, on its face, ambiguous. The Examiner found that Becka meant that something would happen and that Herb Jones clearly understood this. That Becka was not just "fooling" or talking in riddles was amply demonstrated by subsequent events. We think it is inescapable that this was a threat and that the Examiner's finding was correct. As Board member Leedom said in his dissent,

"The only reasonable interpretation of Becka's statements is that if Wells' subcontract was not cancelled, Respondent (the Union) would take strike or other coercive action to pressure Herb Jones into complying with Respondent's (the Union) demands."

See N.L.R.B. v. Plumbers Union of Nassau County, Local 457, Etc., 299 F.2d 497, 500, C.A. 2.

■ As to 2, the Board said that Fusile's statement to Galan was as susceptible of interpretation as a suggestion or request to Galan not to resume work at the Millwood Estates as it was as a threat. We do not agree. Galan was himself a member of the Carpenters

Union and subject to its discipline. The evidence shows that Galan, a man who did not speak or understand English clearly, stood in awe of his union and felt that he had to cooperate with it. On May 9th, at the request of Galan, George Blaha, business agent of the Local Carpenters Union, came to the Valley Road jobsite. He told Galan that no one was working at Millwood, that nothing was settled yet and that he had no choice but to stay at Valley Road. After Herb Jones yielded to the demands of the Union, Galan was told that he could go back to work at the Millwood Estates job.

As to 3, the Board said that Graham's statement to Charles Jones, considered in context, may be interpreted as a request or as a statement of fact and not as a threat to Jones. In our opinion this view is untenable. We have previously commented on the action of Graham in this respect. In a well-reasoned dissent (148 NLRB 760), one member of the Board would affirm the Examiner on his findings herein numbered 1, 2 and 3.

There is substantial evidence to support the findings of the Examiner in relation to these three instances. The evidence clearly shows that Becka started out in March of 1962 with the avowed purpose of forcing Wells off of the Millwood Estates job. He continued to follow through on this single purpose for a year and a half. Finally on May 7, 1963, he elicited the help of Fusile and Graham and in concerted action, by conduct hereinabove described, they accomplished their purpose. The Board would dissect the entire program of Becka into separate events and would find each without significance. Its attempt to excuse singly each act of conduct appears to us to be without substance. Viewing the record as a whole, we conclude that the evidence and the reasonable inferences to be drawn therefrom substantially support the findings and conclusions of the Examiner rather than the conclusions of the Board.

In Universal Camera Corp. v. National Labor Relations Board, supra, the Court said, 340 U.S. at p. 490, 71 S.Ct. at p. 465, * * * "We should fail in our duty to effectuate the will of Congress if we denied recognition to expressed Congressional disapproval of the finality accorded to Labor Board findings by some decisions of this and lower courts, or even of the atmosphere which may have favored those decisions.

"We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

\*　　\*　　\*　　\*　　\*　　\*

"Our power to review the correctness of application of the present standard ought seldom to be called into action. Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals. This Court will intervene only in what ought to be the rare instance when the standard appears to have been

misapprehended or grossly mis-
applied."

We reverse and remand the case to
the Board with instructions to reinstate
the complaint and to issue an order in
accordance with the recommendation of
the Trial Examiner.