United States Court of Appeals,

Fifth Circuit.

No. 91-3606.

BROWN & ROOT, INC., Plaintiff-Appellant,

v.

LOUISIANA STATE AFL-CIO and Baton Rouge Building & Construction Trades Council, Defendants-Appellees.

Jan. 4, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before GARWOOD and DeMOSS, Circuit Judges, and DUPLANTIER,[*] District Judge.

GARWOOD, Circuit Judge:

Plaintiff-appellant Brown & Root (Brown & Root) sued the Louisiana AFL-CIO and the Baton Rouge Building and Construction Trades Council (together hereinafter Unions) for violations of 29 U.S.C. §§ 158(b)(4)(ii) and 187. Following a bench trial, the district court entered judgment in favor of the Unions. Brown & Root now appeals.

**Facts and Proceedings Below**

Cajun Electric Power Cooperative (Cajun) is a Louisiana corporation that generates electrical power. Cajun operates two generating facilities, Big Cajun One and Big Cajun Two, both located in Pointe Coupee Parish, Louisiana. Big Cajun One has two natural gas generating units, while Big Cajun Two has three large coal-fired units. Big Cajun One's employees are represented by the International Brotherhood of Electric Workers, while the Big Cajun Two employees are represented by the Steelworkers Union. Both unions are part of the Louisiana AFL-CIO.

In 1981, Cajun sought the services of a supplemental maintenance contractor at its facilities in Pointe Coupee Parish. In August 1991, after interviewing an equal number of open shop and union contractors, Cajun awarded Brown & Root, an open shop company, the supplemental maintenance contract at Big Cajun Two. The Unions have a long-standing dispute with Brown & Root because

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

Brown & Root has no collective bargaining agreement with the Unions, and its employees have never voted for union representation.

Shortly thereafter, on the morning of August 24, 1981, union representatives appeared at the site of a Cajun Board of Director's meeting and asked to be placed on the agenda. Cajun President James Randall, Executive Vice President James R. Smith, and John Schwab, Cajun's counsel, met with the group. The union representatives were concerned that Cajun was hiring "nonunion people" to do the maintenance work. During the meeting, the Vice President of the Baton Rouge Building and Construction Trades Council identified himself as representing the Teamsters Local Union and said "[W]e cannot permit a [non]union contractor coming in and doing this thing, and we're going to do whatever is necessary to do to see that this doesn't happen." At the directors' meeting, Randall reported on the meeting with the union representatives, indicating that the unions were upset about Brown & Root, but the directors voted to continue the contract with Brown & Root.

On September 1, 1981, union representatives packed the hall at a meeting of the Pointe Coupee Parish Police Jury. The Police Jury passed a resolution requesting that Cajun reconsider its contract with Brown & Root and sent Cajun a copy of the resolution.

In the fall of 1981, Victor Bussie, President of Louisiana AFL-CIO, called two Cajun vice-presidents and expressed concern over Cajun's hiring of Brown & Root. The Cajun officers indicated that no Louisiana company had the requisite experience with coal-fired boilers. Bussie suggested that Cajun hire Mid-Valley Construction Company, a Brown & Root subsidiary whose employees were represented by a union. After being informed that Mid-Valley would not accept maintenance work, Bussie suggested that Cajun contract for the services of an experienced Brown & Root superintendent and hire union laborers to do the work. The vice-presidents informed Bussie that Brown & Root was unwilling to work under that type of arrangement. Bussie apparently ended the conversation by stating "Well, you guys do what you will do and I will talk to my people and they will do what they will do."

In July 1983, Cajun told Brown & Root it would rebid the supplemental maintenance contract. However, a few days later, Cajun suffered a turbine failure in a unit at Big Cajun Two and

decided it was not an appropriate time to bring in a new contractor. In January 1984, after repairs were completed, Cajun requested new bids on the supplemental maintenance contract. The contract was reawarded to Brown & Root, the low bidder, in February 1984. The contract was to remain in effect until June 30, 1985, although Cajun could terminate on 30 days' written notice.

On March 22, 1984, the Pointe Coupee Parish Police Jury met to consider Cajun's request for the issuance of $30 million in pollution control revenue bonds. The Police Jury had approved similar bonds in the past without question. Several union officials attended the meeting and complained that local people were not being employed at Cajun. The Police Jury met again on March 27 and April 10 to consider the bonds. At one point, a committee appointed by the Police Jury informed Cajun that it wanted seventy-five percent of Brown & Root employees to be local residents who had lived in the parish at least five years. At the April 10 meeting, Cajun submitted a letter to the Police Jury acceding to these demands and assuring the Police Jury that Cajun "will require that its maintenance work be substantially performed by local personnel." The Police Jury approved the bonds at the April 10 meeting, and Cajun informed Brown & Root of the residency requirement the next day. Brown & Root agreed to make every effort to meet the requirements within ninety days.[1] The district court specifically found that Cajun agreed to the residency requirement to secure the issuance of the bonds from the Police Jury.

Around May 1984, Louisiana State Senator Campbell introduced Senate Bill 361, which proposed giving the Public Service Commission the authority to regulate the rates of electric cooperatives in Louisiana, including Cajun.[2] Cajun immediately sought lobbying support against the bill. When the Louisiana Association of Business and Industry, a lobbying organization that Cajun frequently turned to, did not help, Cajun asked the Louisiana AFL-CIO for assistance in defeating the legislation. The district court found that "Cajun sought the involvement of the AFL-CIO in the

---

[1]The United States District Court for the Middle District of Louisiana has held that the residency ordinance is unconstitutional. *See Holloway v. Pointe Coupee Parish Police Jury,* No. 84-736-B (M.D.La. June 6, 1986).

[2]The district court found that Senator Campbell was a long-time advocate of rate regulation and had introduced similar bills in the three previous years. It found no evidence that the defendants had requested Senator Campbell to introduce the bills.

legislative process as a lobbyist on *Cajun's* behalf to defeat Senate Bill 361."

At Cajun's request, several meetings were arranged between Paul Wood and Alice Howard, members of ALEC, a trade group closely aligned with Cajun, and Bussie and Bourg, Bussie's assistant. At the first meeting, Bussie stated that because "there were no members of the union working in Cajun's operation, ... he had no need to be involved in any of [Cajun's] legislation." About a week later, a second meeting was held that several of Cajun's officers also attended. The procedures Cajun used in evaluating and awarding job bids were discussed, but the Unions still maintained that they had no reason to be involved in the legislation.

The third meeting took place after the Senate Committee reported SB 361 favorably to the state Senate. Again present were several Cajun officers, Wood, Bussie, and Bourg. At this meeting, Cajun promised to reopen the bidding process at Big Cajun Two and allow union contractors to bid on the contracts. In exchange, Bussie agreed to help Cajun in the legislature, saying "If you work with me, I'll work with you." The district court found that "[d]ue to the lobbying of the AFL-CIO, Senator Campbell's bill was defeated in the Senate by a vote of 26-12."

At a special meeting of the Cajun Board of Directors held May 21, 1984, the Board approved a resolution directing that the supplementary maintenance contract be rebid and that future contracts be bid to utilize union labor. Immediately thereafter, Cajun informed Brown & Root that its contract would be terminated. Cajun sent two letters exercising its option to terminate the contract upon thirty days notice. The contract was terminated, and Brown & Root ceased to work for Cajun on August 31, 1984.

The contract was rebid in June 1984, but Cajun did not allow any open shop companies to submit bids. The contract was awarded to International Maintenance Company, a signatory to a collective bargaining agreement.

In late July 1984, Brown & Root brought this suit against the Louisiana AFL-CIO and the Baton Rouge Building and Construction Trades Council for violations of 29 U.S.C. §§ 158(b)(4)(A) and 187(a). A bench trial was held, and the district court entered judgment in favor of the Unions. The district court found that the AFL-CIO reached an agreement with Cajun that the AFL-CIO would

lobby the Louisiana legislature on behalf of Cajun only if Cajun ceased doing business with Brown & Root and replaced Brown & Root with a union contractor. The district court further found that no threats of labor turmoil or strife were made at any meetings to secure this agreement. The court determined that any statements made by the Unions were ambiguous and did not constitute threats or coercion. The district court also held that "[l]obbying is conduct that is protected under *Noerr-Pennington* and its progeny" and thus that the Unions' "reluctance to lobby is non-coercive for purposes of § 8(b)(4)." Brown & Root now appeals.

## Discussion

A. The Statutory Scheme

Section 8(b)(4) of the National Labor Relations Act (NLRA) provides in relevant part that:

"It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

(B) forcing or requiring any person ... to cease doing business with any other person...." 29 U.S.C. § 158(b)(4).

Section 303 of the Labor Management Relations Act (LMRA) provides that any person who is injured by a labor organization's engaging in "activity or conduct defined as an unfair labor practice in section 158(b)(4)" may sue for damages in federal district court. 29 U.S.C. § 187.

As the district court below noted, section 8(b)(4)(ii) makes it

"unlawful for a labor organization ... to pressure a neutral employer where the object of the union is to force such employer to cease doing business with another employer ... Therefore in order for a labor organization to violate this statute, it must engage in *unlawful activity* against a *neutral* employer for an *unlawful objective.*" *Sheet Metal Workers International Ass'n, Local Union No. 223 v. Atlas Sheet Metal Co. of Jacksonville,* 384 F.2d 101, 105 (5th Cir.1967).

To establish a violation of section 8(b)(4)(ii), more than mere persuasion is necessary: "[T]hat section requires a showing of threats, coercion, or restraints. Those words ... are "nonspecific, indeed vague,' and should be interpreted with "caution' and not given a "broad sweep.' " *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 578, 108

S.Ct. 1392, 1399, 99 L.Ed.2d 645 (1988).  Two separate requirements must be satisfied:  "The first relates to the *nature* of the union's conduct:  whether the union threatened, coerced or restrained any person within the meaning of the section.  The second relates to the *purpose* of the union's conduct: whether an object was to force any person to cease doing business with another."  *Electro-Coal Transfer Corp. v. General Longshore Workers,* 591 F.2d 284, 288 (5th Cir.1979).

We have previously addressed the meaning of "coerce" in section 8(b)(4)(ii):  "[I]t means no more than non-judicial acts of a compelling or restraining nature, applied by way of concerted self help consisting of a strike, picketing or other economic retaliation or pressure in a background of a labor dispute."  *Local Union No. 48 of Sheet Metal Workers Int'l Ass'n v. Hardy Corp.,* 332 F.2d 682, 686 (5th Cir.1964).  By using the word "coerce," Congress "did not intend to proscribe only strikes or picketing, but intended to reach any form of economic pressure of a compelling or restraining nature."  *Associated Gen. Contractors of Calif., Inc. v. N.L.R.B.,* 514 F.2d 433, 438 (9th Cir.1975).  Vague references to "problems" or "trouble," however, are insufficient to constitute a violation of section 8(b)(4)(ii).  *See authorities cited in Ozark Interiors, Inc. v. Carpenters Local No. 978,* 755 F.Supp. 875, 880-82 (W.D.Mo.1990) (surveying cases), *summary judgment reversed,* 957 F.2d 566 (8th Cir.1992).[3]  In order to violate section 8(b)(4)(ii) a union must do more than merely

---

[3]Brown & Root complained that the Unions used the following actions to place pressure on Brown & Root:

> "a. The statement of Doug Partin that the unions would do "whatever is necessary' to keep Brown & Root from coming in;
>
> b. The 1981 resolution of the Point Coupee Parish Police Jury;
>
> c. Louisiana AFL-CIO President Victor Bussie's statement in the fall of 1981 that the unions "will do what they will do';
>
> d. Mr. Bussie's statement in March 1984 that the Cajun Board "could do something if you want to';
>
> e. The residency requirement passed by the Pointe Coupee Parish Police Jury;
>
> f. The unions' influence in preventing the passage of the Public Service Commission bill in the Louisiana legislature."

Brown & Root admitted at oral argument that the crux of their illegal coercion claim is the

induce or encourage, the union must engage in conduct "attended by threats, coercion or restraint." *N.L.R.B. v. Servette, Inc.,* 377 U.S. 46, 54, 84 S.Ct. 1098, 1103, 12 L.Ed.2d 121 (1964).

B. Coercion

The district court examined six different complained-of actions individually and determined that they were either ambiguous or did not rise to the level of threats of concerted union activity against Cajun. On appeal, Brown & Root argues that the district court erred in finding that the Unions' actions were ambiguous and in finding that the actions were not coercive because they did not rise to the level of threats of concerted union activity.[4] We note that whether the union threatened, coerced or restrained Cajun is a question of fact, and we reverse the district court's findings thereon only if clearly erroneous. *See Electro-Coal,* 591 F.2d at 288-89.

*1. Ambiguous*

Unions' lobbying (or refusing to lobby) before the Louisiana Legislature.

[4]We note that Brown & Root's complaint is somewhat ambiguous, and the exact nature of their claims is unclear. The complaint might arguably be construed as complaining not only that the Unions coerced Cajun in violation of section 8(b)(4)(ii)(B), but also that the contract between Cajun and the Unions was illegal under section 8(e) of the NLRA. Section 8(e) provides, subject to certain exceptions, that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees ... to cease doing business with any other person, and any contract or agreement ... containing such an agreement shall be to such extent unenforcible [sic] and void." 29 U.S.C. § 158(e). After reviewing the record, however, we are convinced that Brown & Root claims only a violation of § 8(b)(4). The pretrial order limits Brown & Root's claims to a complaint that the Unions illegally coerced Cajun. Further, the record indicates that the case was tried solely on a theory that the Unions illegally coerced Brown & Root in violation of section 8(b)(4)(ii), and the district court, in its opinion, treated that as the only claim. While casual mention was made at oral argument in this Court that Cajun's agreement with the Unions, in return for their lobbying help, to terminate Brown & Root and resubmit the supplementary maintenance contract so as to exclude open shop bidders (such as Brown & Root) was illegal under section 8(e), the parties briefed only the illegal coercion issue. Accordingly, we decline to address the issue of whether such agreement was illegal as a "hot cargo" contract under section 8(e). In so doing, we note that section 303, which allows parties to sue for damages in federal district court, appears to be limited to violations of section 8(b)(4) and not to extend to violations of section 8(e). *See Atchison, T. & S. F. Ry. Co. v. Locals Nos. 70, 85, & 315,* 511 F.2d 1193, 1195 (9th Cir.1975); *see also Shepard v. N.L.R.B.,* 459 U.S. 344, 351, 103 S.Ct. 665, 670, 74 L.Ed.2d 523 (1983) (concluding that "§ 303 provides a remedy only for violations of § 8(b)(4) of the Act, which, in turn, requires proof of coercion"); *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 82, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982) ("As a general rule, federal courts do not have jurisdiction over activity which "is arguably subject to § 7 or § 8 of the [NLRA],' and they "must defer to the exclusive competence of the National Labor Relations Board.' "). Nothing in this opinion, however, should be interpreted as implying that the agreement Cajun made with the AFL-CIO was legal.

Brown & Root contends that the district court was clearly erroneous in finding that the Unions' conduct was ambiguous. Specifically, Brown & Root argues that the district court reached this conclusion by misapplying the law. Brown & Root's principal argument is that the district court was obligated to examine the Unions' conduct in light of the entire pattern of confrontations between the Union and Cajun, and that examining the conduct against this backdrop dispels any ambiguity.

We agree with Brown & Root's contention that the Unions' entire course of conduct should be examined in determining whether its actions constituted coercion. *See Wells v. N.L.R.B.,* 361 F.2d 737, 742-743 (6th Cir.1966). In *Wells,* an NLRB examiner found that three statements made by the unions were coercive.[5] The NLRB reversed, finding that the statements did not reach the level of threats, coercion or restraint section 8(b)(4)(ii) prohibits. The Sixth Circuit affirmed the examiner:

> "The Board would dissect the entire program of [the union] into separate events and would find each without significance. Its attempt to excuse singly each act of conduct appears to us to be without substance. *Viewing the record as a whole,* we conclude that the evidence and the reasonable inferences to be drawn therefrom substantially support the findings and conclusions of the Examiner." *Id.* at 743 (emphasis added).

While *Wells* does support Brown & Root's contention that the Unions' entire pattern of activity should be examined, it does not support the conclusion that the district court was clearly erroneous in finding the Unions' statements to be ambiguous and thus not coercive. Some of the statements made in *Wells* are similar to statements made by the Unions in the instant case; however, the statements in *Wells* were accompanied by what amounted to a strike. The Sixth Circuit's determination that the unions' statements and acts constituted threats was influenced by the subcontractors' walking off the job: "That [the union representative] was not just 'fooling' or talking

---

[5]The relevant statements were as follows:

(1) a union representative's statement, made in response to a question by a contractor as to what would happen if he did not replace a non-union subcontractor, "Just don't act like a school kid. You know what I'm talking about."

(2) A union representative's statement to a union subcontractor not to go to the job site because the job was stopped.

(3) A union representative's statement to a second union subcontractor that "we are going to have to stop the job" and instruction to take the men to another job.

After the last two statements, the subcontractors left the job sites.

in riddles was amply demonstrated *by subsequent events.*" *Id.* at 742 (emphasis added). Thus, it was the concerted economic activity by union members that allowed the Sixth Circuit to conclude that otherwise ambiguous statements were threats.

Even looking at the entire course of conduct by the Unions in the instant case, it does not appear that the district court clearly erred in concluding that the statements were ambiguous and did not amount to coercion. It is well-established that general predictions of problems or trouble are not alone sufficient to establish threats or coercion within the meaning of section 8(b)(4)(ii). *See Electro-Coal,* 591 F.2d at 288 (surveying cases); *Ozark Interiors,* 755 F.Supp. at 880-882.[6] However, similarly amorphous language has been held to constitute threats or coercion when it is accompanied by action such as strikes or picketing that resolve the ambiguity. *See Pickens-Bond Constr. Co. v. United Bhd. of Carpenters and Joiners of America, Local 690,* 586 F.2d 1234, 1240-41 (8th Cir.1978) (language couched in a "surface neutrality" held coercive because it was "calculated to reinforce and had the necessary effect of reinforcing, the naturally persuasive effects of the picket"); *NLRB v. IBEW Local 453,* 432 F.2d 965 (8th Cir.1970). In the instant case, there was no picketing or walking off the job that served to clarify what the Unions meant by "we're going to do whatever is necessary" or "my people ... will do what they will do." In sum, the mere reference to problems by the Unions may alone be found insufficient to constitute coercion, and the case law establishes that the trier of fact must find such general amorphous statements coercive only when accompanied by actual or threatened picketing or walking off the job or the like or preparations for same. *See Electro-Coal,* 591 F.2d at 288 ("statements by the union officials to the effect that there would be "problems'or "serious problems'" were "ambiguous and do not constitute threats unless accompanied by economic actions such as strikes or picketing that resolve the ambiguity").

*2. Concerted Union activity*

Brown & Root next argues that the district court erred in concluding that the Unions' acts were not coercive because they did not rise to the level of threats of concerted Union activity. They

[6]Our citation of the district court opinion in *Ozark Interiors* implies no disagreement with the decision of the Eighth Circuit that under the particular facts there summary judgment for the union was improper.

contend that *Electro-Coal* stands for the proposition that Unions do not have to threaten violence, imminent lawless behavior, or even concerted activity;  instead, it is sufficient that the unions took advantage of preexisting business pressures on the neutral employer through the medium of a contract.  In *Electro-Coal,* we held that a union's demand for settlement payments to which union members were entitled under a collective bargaining agreement was coercive under 8(b)(4)(ii). *Electro-Coal,* 591 F.2d at 289.  We stated that it was immaterial that "the employers agreed with the unions on the interpretation of the contract and "voluntarily' made the payments" because it did not "mitigate one whit the influence the burden of making the payments would have on the employers' business decisions."  *Id.*

Electro-Coal* is not dispositive, however.  The union in *Electro-Coal* placed the employer in the Hobson's choice by insisting on payments for work not performed by union members—work which the companies were already paying Electro-Coal to do.  *Because of the union's demand,* "[t]he employers thus paid double labor costs for the privilege of loading at Electro-Coal" in order "to meet large grain export commitments."  *Id.*  In *Electro-Coal,* it was the conduct by the union that placed the employers in the no-win situation.  In contrast, the Unions in the instant case did not instigate Cajun's dilemma.  The Unions did not precipitate the introduction of Senate Bill 361, and did not approach Cajun about striking a deal for lobbying assistance.  Cajun simply felt that it was forced to seek lobbying assistance somewhere, and ultimately only the Unions were available.  Further, the Unions did not actively lobby in support of the bill, as they arguably had the right to do, but merely refused to assist Cajun in opposing the legislation, which is something even Cajun's own lobbying organization refused to do.  While we agree, *arguendo,* that a course of action that a union is legally entitled to pursue, such as lobbying in favor of a bill, might, under some circumstances, constitute coercion within the meaning of section 8(b)(4)(ii)(B), we decline to extend such a principle to embrace a union's hesitancy to lobby for or against legislation.

Indeed, the conduct by the Unions in the instant case was much more akin to statements that we refused to find coercive in *Electro-Coal* than to the unions demand for settlement payments.  In *Electro-Coal,* we held that "statements by union officials to the effect that there would be "problems'

or "serious problems' " were "ambiguous and do not constitute threats unless accompanied by economic actions such as strikes or picketing that resolve the ambiguity." *Id.* at 288. The statements by the union officials in the instant case were similarly ambiguous, and thus do not compel a finding that they rose to the level of threats or coercion.

*3. Threats to engage in a protected activity*

Brown & Root's final argument regarding the district court's finding of no coercion is that the district court erred in concluding that a threat to either lobby or not to lobby is itself also protected. Brown & Root cites no case law under section 8(b)(4)(ii) in support of this proposition, but instead relies on the general principle that threats to engage in legal activities can be illegal, and cites blackmail and extortion as examples. They stress that nothing in the statute requires that the coercive pressure itself be unlawful; instead, they contend that the relevant inquiry is whether the threat to engage in lawful activities was used as a means to obtain an unlawful objective.

This general proposition appears to be correct. *See Electro-Coal,* 591 F.2d at 288. Indeed, courts have routinely held that "the otherwise lawful exercise of rights afforded by a collective bargaining agreement can become unlawful when aimed at securing an objective proscribed by section 8(b)(4)." *Sheet Metal Workers, Local Union No. 91 v. NLRB,* 905 F.2d 417, 424 (D.C.Cir.1990); *see also Limbach Co. v. Sheet Metal Workers Intern. Ass'n, AFL-CIO,* 949 F.2d 1241, 1256 (3rd Cir.1991) ("We hold that the threat of cancelling their bargaining agreement could be a powerful economic weapon in the hands of the unions which, if used for prohibited reasons, constitutes coercion within the meaning of the NLRA."); *Local Union No. 25, A/W Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers v. N.L.R.B.,* 831 F.2d 1149, 1154 (1st Cir.1987) (holding that processing invalid grievances under collective bargaining agreement coercive); *International Longshoremen's v. Pacific Maritime,* 773 F.2d 1012, at 1018 (C.A.9) (same); *Carrier Air Conditioning Co. v. NLRB,* 547 F.2d 1178, 1191 (2d Cir.1976) (finding that threat by union to enforce no-subcontracting clause through use of contractual grievance procedure was coercive), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977). *But see Truck Drivers v. NLRB,* 820 F.2d 448 (holding that successful grievances to enforce a collective bargaining agreement do not

constitute an unfair labor practice).

When, however, unions threaten to exercise rights not specially afforded them under the NLRA, courts appear less willing to hold those threats coercive. *See Storer Communications v. National Ass'n of Broadcast Employees and Technicians, AFL-CIO,* 854 F.2d 144, 147 (6th Cir.1988). In *Storer,* the Sixth Circuit held that a threat to engage in conduct protected by the First Amendment was itself protected. *Id.* ("Since the handbilling itself was not proscribed activity, peaceful warnings that handbilling will occur are not unlawful."); *see also Dallas State Employees Local Union 127 v. NLRB,* 633 F.2d 1195, 1197 (5th Cir.1981) ("A threat of legal activity by a union has never before been considered violative of the Act.").

Even assuming that a threat to engage in protected activity is not itself protected if aimed at securing an illegal objective, Brown & Root's argument fails. We are unable to find that the Unions threatened anything. At trial, Cajun's representatives freely admitted that it was their decision to seek out the Louisiana AFL-CIO to request it to lobby on their behalf. There was no pressure or even implied invitation by the Unions for Cajun to do so, and nobody outside of Cajun's circle of representatives suggested that Cajun do so. The evidence supports the conclusion that Cajun, of its own volition, offered to dismiss Brown & Root in order to induce the Unions to enter the legislative process as a lobbyist on Cajun's behalf. There is no evidence that the Unions engineered the introduction of the bill into the Senate or that the Union had even taken a position on the bill until Cajun approached the Unions. We recognize that because of the tenor of the relationship, Cajun impliedly knew that terminating Brown & Root was the price of obtaining the Unions' help on SB 361. However, such a step did not become necessary until Cajun approached the Unions for help. We stress that Cajun did benefit from their agreement with the Unions, and it appears that Cajun would have paid a similar price to any political association that had the lobbying clout to defeat SB 361. In the context of the SB 361 struggle, the Unions' status *qua* union is not shown to have been important to Cajun. Cajun was simply buying the power of a political association, and not the power of any specific type of organization under the NLRA. The Unions simply exercised their First Amendment rights, not any special rights given to them under the NLRA.

Only one other court has considered facts analogous to those in the instant case. *See USS-POSCO Indus. v. Contra Costa County Building & Constr. Trades Council,* 692 F.Supp. 1166 (N.D.Cal.1988) (hereinafter *UPI* ). In *UPI,* the union lobbied for passage of a local toxic waste ordinance that would impede a steel mill modernization project that UPI had planned and awarded to a nonunion contractor. The court concluded that the lobbying was not an unfair labor practice, even if spurred by an improper motive and retaliatory intent, because it was protected First Amendment activity and there was no evidence that the lobbying was not a genuine effort to influence legislation or that UPI was denied a chance to present their views. The lobbying in *UPI* was arguably more coercive than in the instant case since the union in *UPI* actively advocated the adoption of the ordinance and then lobbied for its enforcement against the employer and nonunion contractor, making it difficult for the employer to continue the modernization project on which nonunion labor had been employed. In contrast, the Louisiana AFL-CIO never took any position at all on SB 361 until after being approached by and negotiating with Cajun.

C. First Amendment

The district court concluded that the Unions' actions before the Police Jury and the Unions' refusal to lobby before the Legislature were all protected under the First Amendment and the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine

> "allows individuals or businesses to petition the government, free of the threat of antitrust liability, for action that may have anticompetitive consequences. *Noerr-Pennington* protection is grounded on the theory that the right to petition guaranteed by the First Amendment extends to petitions for selfish, even anticompetitive ends." *Greenwood Utilities Comm'n v. Mississippi Power Co.,* 751 F.2d 1484, 1497 (5th Cir.1985).

The doctrine was announced in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), where the Supreme Court held that the Sherman Anti-Trust Act did not bar an association of railroad companies from seeking legislation and regulations destructive of the trucking industry. The Court has expanded this holding to encompass the petitioning of other public officials besides legislators. *See United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Real Estate Investors v. Columbia Pictures,* --- U.S. ----, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

Courts have also developed a sham exception to the *Noerr-Pennington* doctrine. The exception was first recognized in *Noerr* itself, where the Court stated:

"There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this is certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices." *Noerr,* [365 U.S. at 144,] 81 S.Ct. at 533.

The Court has also stressed that the sham exception requires distinguishing between seeking to influence public officials, which is permitted by *Noerr-Pennington,* and seeking to bar their competitors from meaningful access to adjudicatory tribunals and the decision-making process. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

In 1983, the Supreme Court applied, by way of analogy, the *Noerr-Pennington* doctrine in the labor context. *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). The Court noted that they had "construed the antitrust laws as not prohibiting the filing of a lawsuit, regardless of the plaintiff's anticompetitive intent or purpose in doing so, unless the suit was a "mere sham' filed for harassment purposes," and reasoned that they should "be sensitive to these First Amendment values in construing the NLRA." *Id.* 461 U.S. at 741, 103 S.Ct. at 2169. Based upon these First Amendment concerns, the Court held that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [NLRA]." *Id.* 461 U.S. at 742-43, 103 S.Ct. at 2170. The Court proceeded to import the sham exception to the Noerr-Pennington doctrine into labor law. *See id.* Only one court has applied *Bill Johnson's Restaurants* to analogous facts, and has concluded that lobbying by a Union was protected First Amendment activity and thus did not violate section 8(b)(4)(ii). *See UPI,* 692 F.Supp. at 1170.

Brown & Root contends that even if the Unions' lobbying or refusing to lobby was conduct of the type protected by the *Noerr-Pennington* doctrine, it should not be protected because it was merely a sham use of lobbying. They assert that the lobbying or refusal to lobby, and not the

legislative product of the lobbying, was what caused Cajun to terminate its relationship with Brown & Root. *Cf. City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, ----, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991) (use of governmental process, as opposed to outcome of process, may be sham). We do not find that the sham exception is invoked by these facts. There is no allegation that the Unions' lobbying was anything but "a genuine effort to influence legislation." *Cf. Real Estate Investors,* --- U.S. at ----, 113 S.Ct. at 1927-1929 (subjective intent cannot make out sham litigation unless no reaso nable litigant could realistically expect to secure favorable relief). Neither is there any allegation that the Unions prevented Cajun from having meaningful access to the Senate to present their own views. To the extent that Cajun was precluded from the legislative process in the Senate, it was not the result of the Unions' lobbying against Cajun, but rather because Cajun's own lobbying association did not support Cajun.[7] Given the district court's not clearly erroneous findings of historical fact, it did not err in concluding that the Unions' lobbying activities were protected under the First Amendment.

The Supreme Court's opinion in *DeBartolo* also counsels in favor of the district court's conclusion that the Unions' activities were protected by the First Amendment. Although addressing leafletting and not lobbying, we find the Supreme Court's opinion in *DeBartolo* instructive. In *DeBartolo,* a union engaged in peaceful handbilling of businesses in a shopping mall urging consumers not to shop there because the contractors who built a store in the mall were not represented by a union. The NLRB held that the leafletting constituted coercion. The Supreme Court disagreed. In reaching this conclusion, the Court followed the "cardinal principle" of statutory construction: "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such

---

[7]We recognize that the fact that the Unions apparently had little (if any) interest in the substance of SB 361 militates somewhat in favor of Brown & Root's argument for application of the sham exception. However, we decline to give this one factor controlling significance, particularly as the Unions did not procure the introduction of SB 361 and never supported it, and there is no showing that they even impliedly solicited Cajun's approach to them or previously withheld taking a position on SB 361 in order to put Cajun in the position of having to come to them. Moreover, the Unions were influential in, and apparently needed by Cajun for, the defeat of SB 361, and the defeat of SB 361 was a benefit to Cajun.

construction is plainly contrary to the intent of Congress." *DeBartolo,* 485 U.S. at 574, 108 S.Ct. at 1397. The Supreme Court noted that the interpretation followed by the NLRB posed "serious questions of the validity of § 8(b)(4) under the First Amendment" because on its face, the leafletting "was expressive activity arguing that substandard wages should be opposed by abstaining from shopping in a mall where such wages were paid." *Id.* 485 U.S. at 576, 108 S.Ct. at 1398. In light of these constitutional concerns, the Court independently examined whether there was another interpretation not raising such concerns. The Court reviewed both the language of the section and the legislative history, and concluded that neither foreclosed interpreting section 8(b)(4) as not reaching the handbilling involved in the case. Accordingly, the Court chose to follow the "construction [that] makes unnecessary passing on the serious constitutional questions that would be raised by the Board's understanding of the statute." *Id.* 485 U.S. at 588, 108 S.Ct. at 1404.

Lobbying, like handbilling, is activity protected by the First Amendment. "While the term "lobbyist' has become encrusted with invidious connotations, every person or group engaged ... in trying to persuade Congressional action is exercising the First Amendment right of petition." *Liberty Lobby, Inc. v. Pearson,* 390 F.2d 489, 491 (D.C.Cir.1968) (Burger, Circuit Judge). "The First Amendment right of petition guarantees all citizens the right to appeal to the legislature or the judiciary" and "is not conditioned upon motive." *Wilmorite, Inc. v. Eagan Real Estate, Inc.,* 454 F.Supp. 1124 (N.D.N.Y.1977), *aff'd,* 578 F.2d 1372 (2d Cir.), *cert. denied,* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 655 (1978). Because to hold that lobbying activities constitute coercion within the meaning of section 8(b)(4)(ii)(B) would pose potentially serious First Amendment problems, we follow the prudential course taken by the Supreme Court in *DeBartolo* and construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.

We cannot discern in the language of section 8(b)(4)(ii)(B) any clear indication that governmental lobbying alone "coerces" secondary employers. Neither do we find any clear indication in the legislative history that Congress intended to proscribe such lobbying. Chief among the concerns of the congressional proponents of section 8(b)(4) was the prohibition of consumer boycotts of neutral employers carried out by picketing. The House sponsor of the bill, Representative Griffin

clarified, however, that the bill "would not interfere with the constitutional right of free speech." *DeBartolo,* 485 U.S. at 584, 108 S.Ct. at 1402 (citing 105 Cong.Rec. 14,339 (1959)). Senators who supported the amendments to section 8(b)(4) also recognized the potential constitutional problems and were concerned that the statute not impinge on First Amendment rights. *See Fla. Gulf Coast Bldg. & Const. Trades v. N.L.R.B.,* 796 F.2d 1328, 1345 (11th Cir.1986) (quoting statements of Senators Goldwater and Humphrey indicating their concerns that "the prohibitions of the statute not affect free speech"), *aff'd sub nom. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575-76, 108 S.Ct. 1392, 1398, 99 L.Ed.2d 645 (1988). The legislative history of section 8(b)(4) indicates that the Congress was aware of the potential First Amendment problems raised by the section and did not intend the section to infringe upon constitutional rights. Under the facts as properly found by the district court, we hold that the district court correctly concluded that the Unions' refusal to lobby and subsequent lobbying at Cajun's behest were protected by the First Amendment.

## Conclusion

Having determined that the district court did not err in concluding that the Unions' conduct was not coercive within the meaning of section 8(b)(4)(ii) and was protected by the First Amendment, we

AFFIRM.