Rik LINEBACK, Acting Regional Director of the Twenty–Fifth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

PRINTPACK, INC., Respondent.

PRINTPACK, INC., Counter–Petitioner,

v.

Rik LINEBACK, Individually and as Acting Regional Director of the Twenty–Fifth Region of the National Labor Relations Board; National Labor Relations Board; William B. Gould, IV, Sarah M. Fox and John E. Higgins, Jr., Individually and as Members of the NLRB; and Frederick Feinstein, Individually and as General Counsel of the NLRB, Counter–Respondents.

No. IP 97–1102–C H/G.

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 19, 1997.

Walter Steele, N.L.R.B., Indianapolis, IN,
for Petitioner and Counter–Respondents.

Robert H. Buckler, R. Steve Ensor, Glenn G. Patton, Alston & Bird, L.L.P., Atlanta, GA, Paul H. Sinclair, Ice Miller Donadio & Ryan, Indianapolis, IN, for Respondent and Counter–Petitioner.

## MEMORANDUM OPINION

HAMILTON, District Judge.

Section 10(j) of the National Labor Relations Act ("NLRA") authorizes the National Labor Relations Board ("the Board") to petition a district court for injunctive relief pending final resolution of an unfair labor practice charge. 29 U.S.C. § 160(j). In this case the Board's Regional Director seeks such relief on several unfair labor practice charges pending against defendant Printpack, Inc. The charges arose from Printpack's disputes with the union representing the employees of its flexible packaging factory in Greensburg, Indiana. An administrative law judge ("ALJ") has conducted a hearing for the Board on the underlying unfair labor practices charges, but final resolution of those charges appears it could easily be months or perhaps several years away.

Among many issues here, one appears to be one of first impression: whether a § 10(j) order may require a respondent to seek a stay in another federal lawsuit that the respondent has filed under § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187. The case also raises important issues about the ability of unions and their members to criticize employers when seeking support from third parties in labor disputes. At the heart of this case is a letter that the president of the local union sent to a number of Printpack's customers. The letter began by saying: "I want to alert you to a potentially alarming situation at our plant that could have an impact on the quality of the packaging materials we manufacture for [your Company]." The letter then complained about Printpack's approach to collective bargaining with its employees and said, in the most hotly disputed sentence: "We hope that if the plant's new management provokes a strike, that you will consider withdrawing your patronage, both because we could no longer guarantee the quality of our product and because it would be the right thing to do." Printpack responded to the letter by firing the local president, suing the union and the president, and essentially barring the union president from the factory premises. The Board and the union contend that the local president's letter was a classic exercise of a union's federally protected right to publicize a labor dispute and to seek support for the union's position. They contend that Printpack's response violated § 8(a)(1) of the NLRA. 29 U.S.C. § 158(a)(1). Printpack argues that the letter to its customers was an unlawful and unprotected effort to disparage its products and to coerce those customers into supporting the union in the labor dispute, and thus violated § 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(B). Printpack therefore concludes that its response, including firing the author of the letter and suing the author and the union, was a proper exercise of an employer's rights under federal labor law.

The court has before it the record of the hearing before the Board's ALJ, additional evidence relevant to the parties' requests for injunctive relief, and extensive briefing. This opinion sets forth the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 65. As explained in detail below, the court concludes that the Director has shown a sufficient likelihood that the union's letter to customers was protected activity and that Printpack's response violated federal labor law. The Director has also shown that relief under § 10(j) is, in the terms of the statute, "just and proper." That relief will include reinstatement of the local president and the right to enter the factory premises to represent other employees. In addition, that relief can and will include an injunction ordering Printpack to stay prosecution of its § 303 lawsuit against the union and the president pending final resolution of the unfair labor practice charge directed against that lawsuit. Finally. Printpack has raised in its counterclaims an important question as to whether the Board's internal procedures for deciding whether to seek relief under § 10(j) comply with constitutional due process protections and protections against *ex parte* communications in administrative proceedings under the federal Ad-

ministrative Procedure Act. However, controlling case law shows that this court lacks subject matter jurisdiction over all of Printpack's counterclaims.

### Findings of Fact

On August 22, 1996, Printpack acquired nine flexible packaging facilities, including the facility in Greensburg, Indiana, from the James River Corporation as part of an asset purchase agreement. After Printpack acquired the Greensburg facility, the business of the facility continued virtually unchanged. James River had a long-standing collective bargaining relationship with Local 761–S of the Graphic Communications Union. The last collective bargaining agreement was effective from October 1, 1995, through October 1, 1996. After closing the asset purchase, Printpack recognized Local 761–S as the exclusive bargaining representative for the Greensburg facility and continued to operate under the James River labor agreement. Local 761–S and Printpack began negotiations for a new contract on October 10, 1996. There were three bargaining sessions before December 20, 1996. At that time, Printpack gave the union written notice that the existing contract would terminate at midnight on January 27, 1997. There were six more bargaining sessions through January 28, 1997. However, Printpack and Local 761–S did not reach agreement on a new contract.

At all relevant times, Chris Hancock has been the president of Local 761–S. On January 28, 1997, Hancock sent identical letters to approximately 40 Printpack customers informing them of the inability to reach agreement on a new contract and requesting their support in the event of a strike. That letter is the central document in this case. It stated in full:

Dear Sir:

On behalf of the 450 employees of Printpack, Inc. in Greensburg, Indiana, who are members of Local 761–S, I want to alert you to a potentially alarming situation at our plant that could have an impact on the quality of the packaging materials we manufacture for [your Company].

As you probably know, Printpack, Inc. purchased the operation last August from James River Corporation. We have always prided ourselves on working in a manner that was both productive for our customer and profitable for our management. Now, the new owners are threatening to reduce our ability to do that. We have been offered a contract that would diminish benefits and hamper working conditions for many if not all employees. When we attempted to address these issues in good faith collective bargaining, Printpack refused to budge and eventually issued an ultimatum: Either we agree to accept less than we have proven our work is worth or the Company will institute even more draconian measures next Monday. February 3.

We could understand this attitude if the plant was in financial trouble. But the quality work we produce for loyal customers such as you continues to make a profitable operation. What we are facing, I am afraid, is a new owner bent on increasing margin at the expense of employee and product. We are trying still again this week to convince Printpack, Inc. to bargain in good faith. You have our word that we seek only fair treatment. We hope that if the plant's new management provokes a strike, that you will consider withdrawing your patronage, both because we could no longer guarantee the quality of our product and because it would be the right thing to do. We will try to keep you posted on future developments.

Sincerely,

Chris Hancock, President Local 761–S

On behalf of the Officers and Members

In Greensburg, Indiana

General Counsel Ex. 9.[1] Hancock arranged to have the letter faxed from the local Greensburg office of Edward D. Jones & Company, a nationwide stock broker, and the faxes showed that they had originated from Edward D. Jones & Company.

---

1. All references to "General Counsel" exhibits, "Charging Party" exhibits, and "Respondent" exhibits are to exhibits in the administrative record of the ALJ.

Printpack quickly obtained a copy of the letter from customers. On January 30, 1997, Phil Murphree, General Manager of the Film Products Division of Printpack, sent the following response to Hancock's letter to Printpack employees at the Greensburg facility:

Dear Fellow Employee:

Attached is a copy of a letter that was sent to customers of Printpack this week by your union leadership. The letter is both unlawful and irresponsible. The threat by Mr. Hancock that our employees will sabotage the quality of products and his request that our customers "consider withdrawing patronage" not only hurts the Company, but jeopardizes the jobs of everyone employed in Greensburg. Printpack will not tolerate this kind of irresponsible action and will respond to the full extent the law allows.

You also need to know that Mr. Hancock's claim that Printpack has not bargained in good faith and has issued the union "an ultimatum" is untrue. In fact, the entire proposal that has been offered in Greensburg is the same proposal that has been voted on and accepted in the last month by members of the OCAW in New Castle, Delaware, and the GCIU and IAM in St. Louis, Missouri, with two exceptions. First the contract in New Castle runs through December 31, 1999, and the contract in St. Louis runs through February 29, 2000. The contract we have offered in Greensburg is only through December 31, 1997. We have not only explained to the union bargaining committee the reason for our desire for a shorter contract in Greensburg, but told them that if they wanted a contract through December 31, 1998, all they needed to do was ask for it. At this point, they have declined to make any such request. Second, in Greensburg we have proposed that in all arbitrations, the loser of the arbitration (either the Company or the Union) pay all of the costs associated with the arbitration up to a maximum amount. Our reason for proposing this is that it will force both sides to only go to arbitration when (1) the issue is worth fighting for and (2) both sides really believe they are right and will win. Another benefit of this proposal should be a reason-

able settlement of more grievances. Finally, on January 16, 1997, the Company offered to make the first year pay increase retroactive to October 1, 1996, but conditioned the offer of retroactivity on a ratified contract by the end of January. Your committee, for reasons unknown to the Company, elected to delay any vote until next week, thereby eliminating the possibility of retroactivity. I am telling you about negotiations now, not only because of the attached letter, but also in response to the large number of employees who have complained about being kept in the dark by their negotiating committee.

I truly believe that most of our employees were not aware of the letter sent to our customers and do not support it. I encourage you to insist that Mr. Hancock write each of the customers sent the letter, apologize to them and pledge to each of them our continued commitment to quality.

Sincerely,

Phil Murphree

General Manager, Film Products Division

General Counsel Ex. 11.

Printpack experienced three acts that it describes as sabotage at the Greensburg plant about a week after Hancock sent the letter to the customers. On February 6, 1997, sand was poured into an air compressor. Sand was also found in a resin box full of resin that was not to be used. In addition, telephone lines were damaged in Printpack's bag department cutting off service in the bag department and the warehouse. Printpack brought in an investigator to determine the cause of the damage. The air compressor had not actually been damaged, but the investigator determined that a handful of sand had been placed in the air compressor. Charging Party Ex. 3 at 1–2. He could not determine who was responsible for placing the sand in the compressor. The investigator also found that sand (about the amount contained in a large coffee container) had contaminated a resin box, but it was not the same type of sand found in the air compressor. According to the investigator, the sand was in resin that was not going to be used to make Printpack's product. *Id.* at 2. The

investigator's findings as to the third incident were similarly inconclusive. *Id.* at 3. The investigator spoke to a telephone repair person who said that the telephone wires had been pulled apart and not cut. The investigator reported a rumor on the floor that a forklift had hooked the wires and pulled them down. The telephone wires were located in an area where pallets were stored and moved by forklifts. The investigator reported no conclusions as to whether the telephone wire damage was deliberate or accidental. He did not identify any suspects for any of the three incidents.

On February 10, 1997, Printpack implemented a new contract without Local 761–S's agreement. As a result, Printpack stopped withholding union dues from paychecks and distributing them to Local 761–S under the dues check-off provision in the old contract.

On February 14, 1997, Printpack's attorney Robert Buckler informed Hancock that he was going to be a defendant in a lawsuit because he had written and sent the letter to customers. ALJ Hearing Transcript at 478. On February 18, 1997, Printpack fired Hancock because he had sent the letter to Printpack's customers.

After Printpack fired Hancock and stopped withholding union dues from employees' paychecks, the number of union members not paying their dues increased from virtually none to 150. Hancock Testimony, Aug. 25, 1997. The vice presidents and stewards of Local 761–S attempted to collect dues from employees either at the plant or the union hall, but they avoided directly soliciting members for their dues on company premises. A notice to members about how to pay dues was posted on a union bulletin board in the Printpack facility.

After Printpack fired Hancock, it also denied him entry to the Greensburg facility to represent employees in grievance proceedings, except to grieve his own discharge. On February 19, 1997, Printpack filed a lawsuit in this court, *Printpack, Inc. v. Graphic Communications Union Local 761–S, Graphic Communications International Union, and Chris Hancock.* The case was docketed in this court as No. IP 97–0251–C and is pending before Judge Dillin. Print-

pack's amended complaint alleges in Count 1 that Hancock's letter constituted illegal secondary activity under § 8(b)(4)(ii)(B) of the NLRA and seeks damages under § 303 of the LMRA, 29 U.S.C. § 187. Printpack alleges in Count 2 that the letter constituted tortious interference with business relations with its customers. Count 3 alleges that Local 761–S is liable for destruction of Printpack property from the alleged acts of sabotage. The defendants in that case moved to dismiss for failure to state a claim upon which relief can be granted. On July 15, 1997, Judge Dillin dismissed Printpack's claim against Hancock under § 303 but denied the defendants' motion to dismiss the rest of the case.

On June 20, 1997, Local 761–S began a strike at Printpack's Greensburg facility. One condition of receiving strike benefits is that union members must be current on their union dues. As a result, 99 percent of Local 761–S members had caught up on their dues by the time the strike began. As of August 25, 1997, more than 80 percent of the Local 761–S bargaining unit at Printpack remained on strike, and all but one of the local's members have fully paid their monthly union dues.

The Board's ALJ conducted a hearing on Local 761–S's unfair labor practice charges from June 23 through June 25, 1997. On July 7, 1997, the Board's Regional Director filed this action under § 10(j) to obtain injunctive relief pending the final decision of the Board on the relevant unfair labor practice charges against Printpack. Specifically, the Director seeks the injunction ordering Printpack to: (1) immediately reinstate Chris Hancock, President of Local 761–S, to his former or to a substantially equivalent position without prejudice to his seniority or other rights previously enjoyed at Printpack; (2) file a motion in the § 303 lawsuit pending before Judge Dillin requesting that the court stay proceedings in that cause with respect to Counts 1 and 2 of the lawsuit; and (3) allow Hancock access to Printpack's facility for the processing of grievances. The court conducted a hearing on August 25, 1997, to hear evidence on the need for injunctive re-

lief beyond that presented at the administrative hearing.

## I. *The Regional Director's Petition for § 10(j) Injunctive Relief*

The Board is authorized to petition a district court for temporary relief upon issuance of an unfair labor practice complaint under § 10(j) of the Act. Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice. to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). An injunction granted under § 10(j) is an "extraordinary remedy." *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir.1989). It should "be granted only in those situations in which effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." *Id.* The burden is on the Director to show that injunctive relief is, in the terms of the statute, "just and proper."

In *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1567 (1996), the Seventh Circuit has recently given district courts detailed instructions on handling requests for injunctive relief under § 10(j). The court's opinion spelled out a four-part test for § 10(j) relief, drawn from the general standards that apply to motions for preliminary injunctions:

> First, the Director must show that she has no adequate remedy at law. [*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir.1984).] In other words, she must show that an award of damages would be "seriously deficient." *Id.* Second, the Director must demonstrate that "public harm" would result absent the

injunction. *P\*I\*E Nationwide*, 878 F.2d at 210. Third, the Director must show that the labor effort would be irreparably harmed absent the injunction, and that the irreparable harm outweighs any irreparable harm to the employer. *Roland Machinery Co.*, 749 F.2d at 386–87. * * * The fourth requirement is that the Director show that she has some likelihood of succeeding on the merits—that she has a "better than negligible" chance of winning. *Id.* at 387. Once the Director establishes some likelihood of success, "the court must then determine how likely that success is, because this affects the balance of relative harms.... The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor...." *Id.* at 387. In other words, a strong showing by the Director of likely success on the merits can offset a weak showing of harm.

83 F.3d at 1567–68. The court also allocated the burden of proof as follows:

> The Director must satisfy the first two requirements by a preponderance of the evidence. The Director must also show irreparable harm by a preponderance of the evidence. However, the Director need not demonstrate that the harm to the labor effort outweighs the harm to the employer if the Director makes a strong showing under the fourth requirement.

*Id.* The court will address first the Director's likelihood of success on the merits of the unfair labor practice charges, and then the equitable factors that govern whether injunctive relief here would be "just and proper."

### A. *Likelihood of Success on the Merits*

There are numerous unfair labor practice charges pending against Printpack, but the Director seeks injunctive relief with respect to only three of them. First, the Director argues that Printpack's actions in firing Hancock and sending Murphree's letter to all Greensburg employees in response to Hancock's letter violated §§ 8(a)(1) and 8(a)(3) of the NLRA. Second, the Director argues that Printpack's lawsuit against Hancock, Local 761–S, and the international union violated § 8(a)(1) of the NLRA. Third, the Director contends that Printpack's refusal to allow

Hancock access to the Printpack facility to process grievances violated §§ 8(a)(1) and 8(a)(5) of the NLRA. Although *Electro–Voice* and many other cases require this court to evaluate on a preliminary basis the Director's likelihood of succeeding on the merits of these charges, it is important to emphasize that the district court "has no jurisdiction to pass on the merits of the underlying case before the Board," 83 F.3d at 1567, and that the district court's analysis "should not be taken as a finding in favor of the Director on the merits." *Id.* at 1570. This court considers the likelihood of success on the merits only for the purpose of deciding whether injunctive relief is warranted.

### 1. *Printpack's Decision to Fire Local President Hancock*

■ Section 7 of the NLRA provides that employees "shall have the right to self organization ... to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157. The Director argues that Printpack's decision to fire Hancock and its threats of unspecified reprisals by Printpack in Murphree's January 30 letter to employees violated §§ 8(a)(1) and 8(a)(3) of the NLRA. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment ... to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

It has long been settled that employees in disputes with their employer have the right under § 7 to seek aid and support from third parties. "The 74th Congress knew well enough that labor's cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context." *Eastex, Inc. v. NLRB,* 437 U.S. 556, 565, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978). In *NLRB v. Servette, Inc.,* 377 U.S. 46, 49–51, 84 S.Ct. 1098, 1101–

02, 12 L.Ed.2d 121 (1964), the Supreme Court held that striking employees of a wholesale food distributor engaged in protected activity when they asked managers of supermarkets that were customers of their employer to support the strike by discontinuing purchases from the employer. See also *id.* at 54 n. 12, 84 S.Ct. at 1104 n. 12 (with respect to handbilling an employer's customers, quoting legislative history to effect that it is an unfair labor practice to try to coerce or threaten an employer to get him to stop doing business with another firm, *"but not to persuade or ask him"* ). The right to seek support from third parties—in a non-coercive manner—is an essential part of the balance of power struck by Congress in federal labor legislation. See generally *Florida Gulf Coast Building & Construction Trades v. NLRB,* 796 F.2d 1328, 1332–35 (11th Cir. 1986) (discussing protection of handbills and leaflets, as well as limits on that protection); *Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers Local 494,* 798 F.2d 1016, 1019–21 (7th Cir.1986) (union's picketing and leafletting of employer's customer were coercive and not protected where union urged public not to do business with customer at all instead of limiting request to product in dispute); *Hasbrouck v. Sheet Metal Workers Local 232,* 586 F.2d 691, 693–94 (9th Cir. 1978) (union's publication of "Do Not Patronize" list in newspaper was protected so long as labor dispute existed). Hancock's letter in this case is similar to the protected activity in *NLRB v. Servette, Inc.*—asking customers to consider withholding their patronage from an employer with whom the union had a labor dispute. The principal difference is that Hancock's letter was in anticipation of a possible strike, and it asked customers to withhold their business only if a strike were to occur.

Printpack contends that Hancock's letter was not protected activity under the NLRA because it disparaged Printpack's management, threatened the quality of Printpack products, and was written at a time when Local 761–S's members were still producing Printpack's products and collecting their paychecks. Printpack relies on *NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers,* 346 U.S. 464, 74 S.Ct.

172, 98 L.Ed. 195 (1953) ("*Jefferson Standard*") which recognize the "disparagement" exception to § 7 protection. In *Jefferson Standard,* technicians at a television station were involved in a dispute with their employer. They distributed handbills that attacked the quality of their employer's product and suggested that the employer considered its customers part of a "second-class city." *Id.* at 468, 74 S.Ct. at 174–75. The handbills did not mention any labor dispute much less ask for help in a labor dispute. The Supreme Court held that the employer did not violate federal labor law by firing the employees for disloyalty. *Id.* at 475–76, 74 S.Ct. at 178–79.

The reach of the *Jefferson Standard* exception is not self-evident, but the Board and most courts have interpreted the disparagement exception to apply when an appeal to a third party attacks the quality of the employer's product and is not connected to an ongoing labor dispute. See *Sierra Publishing Co. v. NLRB,* 889 F.2d 210, 217 (9th Cir.1989) ("First and most important, there is no dispute that the letter was related to the labor dispute and to the employees' efforts to improve their working conditions."); *Coors Container Co. v. NLRB,* 628 F.2d 1283, 1285 (10th Cir.1980) (*Jefferson Standard* was based on two elements: "(1) the attack was on the quality of the employer's product, and (2) it was not connected to a labor controversy"); *NLRB v. National Furniture Manufacturing Co.,* 315 F.2d 280, 284 (7th Cir. 1963) ("was the conduct of the employees, obviously concerted activity arising out of a labor dispute, illegal, or an example of such disloyalty that we may term it 'indefensible' " within the meaning of *Jefferson Standard?* ). The Board has characterized *Jefferson Standard* as holding that "employees may engage in communications with third parties in circumstances where the communication is related to an ongoing labor dispute and when the communication is not so disloyal, reckless, or maliciously untrue to lose the Act's protection." *Emarco, Inc.,* 284 NLRB 832, 833, 1987 WL 89746 (1987).

Printpack contends that because its employees were not on strike at the time Hancock sent his letter, the letter is not protected. However, whether Hancock's letter was protected activity does not depend on whether a strike had already begun. Employees' § 7 rights are not limited to strikes. Concerted activity is protected if it is part of a "labor dispute," without being limited specifically to a strike. In *National Furniture Manufacturing,* the Board had found that employees were engaged in protected activity under § 7 when they distributed handbills complaining of their employer's refusal to bargain with their union at a trade show. 315 F.2d 280, 283. The Seventh Circuit enforced the Board's decision. Although the employees had at one time been on strike, they were no longer on strike when they distributed the leaflet. The Seventh Circuit said: "The history of respondent's labor problems lent itself to the union's desire to reinforce its organizational efforts by use of this type of publicity." *Id.* at 286.

In addition, the NLRA itself defines a "labor dispute" as including "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment...." 29 U.S.C. § 152(9). The evidence plainly demonstrates Hancock and Local 761–S were involved in a labor dispute with Printpack. At the time Hancock sent his letter on January 28th, the company and the union had been attempting to reach an agreement on a new contract for four months. In late December 1996, Printpack gave notice that it planned to terminate the old contract as of January 29, 1997. Hancock Aff. ¶ 11 (Feb. 26, 1997). Local 761–S had requested bargaining over new plant rules and a new nepotism policy and had not reached agreement with Printpack on several important areas of the contract. Also on January 28th, Printpack had informed the union that if the union did not accept its current contract offer, the company would unilaterally implement that offer in less than two weeks. The evidence shows that a controversy did exist between Printpack and Local 761–S so that the Board could easily find a labor dispute existed between the parties when Hancock sent his letter to customers.

The letter did not attack the current quality of Printpack's products, but Printpack argues that the letter amounted to a threat by the union to harm the quality of the products. The argument is not persuasive. Hancock's letter said that *if* a strike were to occur, the striking union members "could no longer guarantee the quality of our product." That is not a threat; it only reminds customers of the obvious—if an employer manages to continue production during a strike, it may be doing so with less experienced and less skilled workers, so that product quality may suffer. At the very least, the Board is not *required* to treat the Hancock letter as an unprotected threat of coercion.

The Ninth Circuit explained in *Sierra Publishing Co. v. NLRB* that "suggestions that a company's treatment of its employees may have an effect upon the quality of the company's products, or may even affect the company's own viability are not likely to be unreasonable, particularly in cases when the addressees of the information are made aware of the fact that a labor dispute is in progress." 889 F.2d 210, 220 (9th Cir.1989). In *Sierra Publishing,* the union sent a letter to a newspaper's advertisers stating that the union had been trying for a year and a half to get a contract, that the paper's circulation had been declining, and that the newspaper was heading downhill. The Board held that the letter was protected activity and the Ninth Circuit enforced the Board's decision. Like the letter in *Sierra Publishing,* the majority of Hancock's letter complained about the state of contract talks between the parties. Hancock's letter clearly informed Printpack's customers that there was a labor dispute and that the labor dispute might cause problems at Printpack and affect its products in the event of a future strike. In fact, the Hancock letter is considerably more restrained in tone than the letter in *Sierra Publishing.* The Hancock letter did not attack the current quality of Printpack's products at all. It merely asserted that if a strike occurred, replacement workers would not be able to ensure the same level of quality.

In addition, Hancock's letter was not so disloyal, reckless or malicious as to lose § 7

protection. In *Diamond Walnut Growers,* the Board found a union leaflet to be protected activity which proclaimed that, "Diamond management appears to be looking the other way while scabs package walnuts with mold, dirt, oil, worms and debris," and urged a boycott of the employer's products. 316 NLRB 36, 46–47, 1995 WL 25644 (1995), *enf. granted in part and denied in part,* 113 F.3d 1259 (D.C.Cir.1997) (*en banc*). The Board found that the statements were linked to a labor dispute and "the fact that they may be biased or contain hyperbole does not render them unprotected." *Id.* at 47. The burden was on the employer to establish that the statements were false and malicious, and the employer did not meet that burden. *Id.* Hancock's letter is much less inflammatory than the leaflet in *Diamond Walnut Growers.* Hancock's letter did not speak of an ongoing harm to the employer's product, but of the future potential effects of a strike, and it did so in the mildest of terms:

> We hope that if the plant's new management provokes a strike, that you will consider withdrawing your patronage, both because we could no longer guarantee the quality of our product and because it would be the right thing to do.

The Director has presented substantial evidence showing that Hancock's letter was protected activity under § 7 of the NLRA.

Since Printpack has admitted that Hancock's discharge was based solely on his letter to Printpack's customers (which appears highly likely to have been protected activity under § 7), the Director has a substantial likelihood of succeeding on the merits of the underlying §§ 8(a)(1) and 8(a)(3) unfair labor practice charges. Section 8(a)(3) prohibits Printpack from discharging Hancock because of his union activities, the exact reason given by Printpack for its discharge of Hancock. Section 8(a)(1) makes it an unfair labor practice for Printpack to interfere with Hancock's and its employees' exercise of the § 7 right to engage in "concerted activities for the purpose of collective bargaining." The letter sent out by Phil Murphree on January 30th in response to Hancock's letter states that Printpack will not tolerate this type of activity and it "jeopardizes the jobs of every-

one employed in Greensburg." Hancock's activity, however, is likely to be considered protected activity and interference with protected activity constitutes an unfair labor practice. Murphree's letter is substantial evidence in support of a § 8(a)(1) charge that Printpack was attempting to interfere with its employees' right to participate in § 7 concerted activities. The Director has shown a very substantial likelihood of succeeding on the merits on the § 8(a)(1) charge.

### 2. Printpack's Lawsuit Under § 303

■ The Director next seeks a stay of Counts 1 and 2 in Printpack's lawsuit filed against Local 761–S, the international union, and Hancock. The Director argues that prosecution of those claims violates § 8(a)(1) of the NLRA by unlawfully restraining employees in the exercise of their § 7 rights. Printpack's suit pleads three causes of action based on Hancock's letter to Printpack customers and the alleged acts of sabotage after the letter was sent. Count 1 is based on § 303 of the LMRA, which provides a damage remedy for § 8(b)(4) violations.[2] Count 2 alleges that all three defendants' actions tortiously interfered with Printpack's business relations with its customers. Count 3 alleges that unnamed agents of Local 761–S intentionally damaged Printpack's property.

On July 15, 1997, Judge Dillin ruled on the defendants' motion to dismiss the Printpack lawsuit for failure to state a claim. *Printpack Inc. v. Graphic Communications Union Local 761–S, et al.,* Cause No. IP 97–0251 (S.D.Ind. July 15, 1997). Judge Dillin found that Printpack had pleaded claims for relief under the liberal standards that govern motions under Fed.R.Civ.P. 12(b)(6). The court must construe all facts in favor of the plaintiff and cannot grant the motion unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." Slip op. at 4, quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). Judge Dillin applied a two-prong test to determine whether Printpack had sufficiently alleged that Local 761–S had violated § 8(b)(4) of the NLRA. The test requires a court to determine (1) "whether the union threatened, coerced or restrained any person within the meaning of the section" and (2) "whether an object was to force any person to cease doing business with another." *Id.* at 6, quoting *Brown & Root, Inc. v. Louisiana State AFL–CIO,* 10 F.3d 316, 320 (5th Cir. 1994). A court should "consider the union's entire course of conduct." *Id.,* citing *Brown,* 10 F.3d at 321. Applying these standards and construing all facts in favor of the plaintiff Printpack, Judge Dillin said:

> [T]he Court is convinced that dismissal of Printpack's federal claim would be inappropriate. First, the nature of the union's conduct is drawn into question not only by the content of the letter in issue, but also by the subsequent acts of sabotage. The ambiguity in the letter becomes apparent when the reader learns that the letter issued while members of Local 761–S still were producing the Printpack product. Because union members were in control of the product, one could reasonably interpret the letter to suggest that union members themselves were in a position to compromise the quality of the product and were contemplating such act. Moreover, the Court believes that the alleged acts of sabotage and the manner in which those acts affected or may have affected Printpack's customers is a significant factor in this action. We are persuaded that fur-

---

**2.** Section 303 provides:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended.

(b) Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) may sue therefor in any district court of the United States....

29 U.S.C. § 187. The relevant portion of § 8(b)(4) provides that it is an unfair labor practice for a labor organization or its agents

to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is ... forcing or requiring any person ... to cease doing business with any other person....

29 U.S.C. § 158(b)(4)(ii)(B).

ther factual development of such conduct is necessary.

\* \* \* \* \* \*

If the letter ultimately is deemed threatening or coercive, certainly Printpack could prove that the purpose of the threats or coercive conduct was to force Printpack's customers to cease doing business with Printpack.

*Id.* at 7–8. Finally, Judge Dillin dismissed Printpack's § 303 claim against Hancock individually because § 303 authorizes claims only against labor organizations.

The Director seeks an injunction to require Printpack to seek a stay of further action on Counts I and 2 of the lawsuit pending the Board's final resolution of the unfair labor practice charge directed against Printpack's filing of the lawsuit. The Board does not seek to force a stay of proceedings on Count 3 of the Printpack lawsuit, which alleges that agents of Local 761–S committed criminal mischief by damaging company property. Printpack responds that it has a right under federal law— § 303 of the LMRA—to bring and pursue its claims in the § 303 action. It also contends that Judge Dillin's decision denying the union's motion to dismiss those claims shows that its claims are not baseless and that an injunction against prosecution of the lawsuit would be an unprecedented and improper application of § 10(j).

Whether prosecution of a lawsuit amounts to an unfair labor practice is governed by *Bill Johnson's Restaurants v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). There the Supreme Court reviewed a Board decision to stay the prosecution of a civil suit brought by an employer against its employees in state court for unlawful picketing, harassment of its customers, and threatening public safety. In remanding the matter to the Board, the Court held that "it is an enjoinable unfair labor practice to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by § 7 of the NLRA." *Id.* at 744, 103 S.Ct. at 2170. For the court to issue a § 10(j) injunction here, the Director must show a reasonable likelihood that Printpack filed the lawsuit based on an improper mo-

tive and that there is no reasonable basis in law or fact for the suit. See *Hoeber v. Local 30, United Slate, Tile & Composition Roofers,* 939 F.2d 118, 126 (3d Cir.1991) (finding that an improper motive and lack of reasonable basis in law must exist before a court can issue a § 10(*l*) injunction against union prosecution of a § 301 civil suit to enforce labor arbitration award).

### a. *Lack of Reasonable Basis in Law or Fact*

The legality of Hancock's letter under § 7 of the NLRA and evidence of sabotage against Printpack by Local 761–S are at the heart of both Counts 1 and 2 of Printpack's lawsuit. Count 1 alleging violations of federal labor law obviously depends on whether the Hancock letter violated § 8(b)(4), as well as on any evidence showing that union agents were responsible for sabotage. Count 2 for tortious interference with business relations depends on the same questions.

To show that its lawsuit has a reasonable basis in law and fact, Printpack relies primarily on Judge Dillin's opinion denying the union's motion to dismiss. However, there is a significant difference between the standard in *Bill Johnson's Restaurants* to determine whether a lawsuit is baseless and the standard under which a court reviews a Rule 12(b)(6) motion to dismiss. When considering a Rule 12(b)(6) motion, the court must accept as true the complaint's "well-pleaded factual allegations." *Chakonas v. City of Chicago,* 42 F.3d 1132, 1134 (7th Cir.1994). Local 761–S would be entitled to dismissal of the Printpack lawsuit only if it were clear that Printpack would not be entitled to relief under any set of facts that might be proved within the scope of the complaint's allegations. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Chaney v. Suburban Bus Div. of Regional Transportation Auth.,* 52 F.3d 623, 627 (7th Cir.1995).

It is not the role of this court to determine with finality whether the Printpack suit meets the *Bill Johnson's Restaurants* test. This court's task is to determine whether the Director has presented evidence which, if presented to the Board or an ALJ,

would be sufficient for the Board to find that Printpack's suit lacked a reasonable basis in law or fact and that the lawsuit constituted an unfair labor practice under § 8(a)(1). The Director has met that burden. First, Count 1 of Printpack's lawsuit alleging that Hancock's letter threatens Printpack's customers under § 8(b)(4) is integrally related to the legality of Hancock's letter under § 7 of the NLRA. Section 8(b)(4)(ii)(B) provides that it is an unfair labor practice:

> to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is ... forcing or requiring any person ... to cease doing business with any other person....

29 U.S.C. § 158(b)(4)(ii)(B). For a labor organization to violate this section " 'it must engage in *unlawful activity* against a *neutral* employer for an *unlawful objective'*." *Brown & Root, Inc. v. Louisiana State AFL–CIO,* 10 F.3d 316, 320 (5th Cir.1994), quoting *Sheet Metal Workers International Association, Local Union No. 223, AFL–CIO v. Atlas Sheet Metal Co. of Jacksonville,* 384 F.2d 101, 105 (5th Cir.1967). This inquiry is made in two parts:

> The first relates to the *nature* of the union's conduct: whether the union threatened, coerced or restrained any person within the meaning of the section. The second relates to the *purpose* of the union's conduct: whether an object was to force any person to cease doing business with another. *Electro–Coal Transfer Corp. v. General Longshore Workers,* 591 F.2d 284, 288 (5th Cir.1979)

*Brown,* 10 F.3d at 320. In making this inquiry, a court should examine Local 761–S's "entire course of conduct." *Id.* at 321. But the court must keep in mind that the union has every right to seek the aid of third parties in its dispute. That right includes asking customers in a non-coercive manner to stop doing business with the employer. *E.g., NLRB v. Servette, Inc.,* 377 U.S. at 49–51, 84 S.Ct. at 1101–02.

The court has already explained why Hancock's letter does not appear to be coercive. To support its position, Printpack relies on Judge Dillin's observation that the "union's conduct is drawn into question not only by the content of the letter in issue, but also by the subsequent acts of sabotage." *Printpack,* Cause No. IP 97–251–C, slip op. at 7. But Judge Dillin had to make his decision on the motion to dismiss without any evidence in the record. He was required to take the factual allegations of Printpack's complaint as true in determining whether the "union's entire course of conduct" could be coercive or threatening. See *id.* at 4. This court has before it the administrative record of the proceedings before the ALJ, during which Printpack was provided an opportunity to present evidence that would support the claims before Judge Dillin. At the administrative hearing, Printpack presented no evidence linking the union or Hancock's letter with alleged subsequent acts of sabotage. Printpack's Human Resources Manager admitted that a report made by an independent investigator after the three possible incidents of sabotage found no information that would connect Hancock or the union to the three incidents. ALJ Hearing Transcript at 239. The investigator could not determine who was responsible for the incidents, and his report indicates that one of the acts may simply have been an accident. Charging Party's Ex. 3. No damage was done by the other two incidents. See *id.* The court has already explained why the Board is highly likely to find that Hancock's letter was protected activity. In the absence of any evidence linking the letter or the union to any acts of sabotage, the Board could easily find that the allegations of sabotage also lack a reasonable basis in fact.

■ Count 2 of Printpack's lawsuit alleges that Hancock and the union tortiously interfered with Printpack's business relations. The analysis here is essentially identical as for Count 1. A claim for tortious interference with business relations under Indiana law requires proof that the "defendant acted illegally in achieving his end." *E.g., Watson Rural Water Co. v. Indiana Cities Water Corp.,* 540 N.E.2d 131, 139 (Ind.App.1989); accord, *Wright v. Associated Insurance Cos.,* 29 F.3d 1244, 1252 (7th Cir.1994); *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 542 (7th Cir.1986) ("[L]imitations

by the various authorities on the tort of interference with prospective business relations are appropriate. Competitors and their allies are not necessarily gentlemen—or even scholars. Competition may be rough and tumble and even—within reasonable bounds—involve economic factors extraneous to the main competition itself."). The only way that Hancock's letter could be found unlawful is as a violation of § 8(b)(4). The allegations of sabotage depend on the same evidence at issue under Count 1. The Board could find that the same evidence shows that Count 2 also lacks a reasonable basis in fact.

### b. *Improper Motive*

■ The second prong of the *Bill Johnson's Restaurants* test requires that the Board find that Printpack filed its lawsuit with an improper motive or in retaliation for protected activity before it can find that the lawsuit was an unfair labor practice and a violation of § 8(a)(1) of the NLRA. The Director has shown a substantial likelihood of succeeding on this issue. First, Printpack filed its lawsuit immediately after it fired Hancock for sending the January 28th letter to Printpack customers. Second, the January 30th letter from Phil Murphree told Printpack employees that Hancock's letter is "unlawful and irresponsible." General Counsel's Ex. 11. Murphree's letter also stated that "Printpack will not tolerate this kind of irresponsible action and will respond to the full extent that the law allows." *Id.* Third, Printpack's attorney Robert Buckler told Hancock that he would be the subject of a lawsuit for writing the letter. ALJ Hearing Transcript at 478. The Board has found that retaliatory motive may be inferred where a lawsuit is aimed at protected concerted activity and where damages were sought for engaging in protected activity. *Phoenix Newspapers,* 294 NLRB 47, 50 & n. 19, 1989 WL 224213 (1989); see also *H.W. Barss Co.,* 296 NLRB 1286, 1287, 1989 WL 224405 (1989) (finding that "retaliatory motive can be inferred, in part, from [company's] prayer for money damages"). This motive may be inferred even if the plaintiff asserts good faith reasons for the suit. *Phoenix Newspapers,* 294 NLRB at 50. Moreover, an inference of improper motive is permissible from the lack of a reasonable basis in fact. The evidence shows a substantial likelihood that the Director will succeed in demonstrating that Printpack filed its lawsuit for retaliatory purposes.

It is generally easier for one party to show that it is entitled to win a lawsuit than to show that the other side's case lacks a reasonable basis in fact and was brought for an improper motive. The court has found that the Director has shown a high probability of succeeding on the unfair labor practice charge based on the firing of Hancock. On the charge based on Printpack's lawsuit, the case is not quite as strong, but the Director has certainly shown at least a reasonable likelihood of succeeding on that charge as well.

### 3. *Hancock's Access to the Printpack Facility*

■ The Director argues that Printpack has violated §§ 8(a)(1) and 8(a)(5) of the NLRA by refusing to allow Hancock, after it fired him, to enter the Greensburg facility to fulfill the union's obligations as the exclusive collective bargaining representative of the unit. Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees ..." 29 U.S.C. § 158(a)(5). In particular, the Director claims that Hancock has been denied access to the facility to represent union workers in the three-step grievance procedure set out in the parties' prior collective bargaining agreement. Printpack does not deny that it has refused Hancock access, but it defends its action as consistent with having the grievance proceedings handled internally by union stewards who are also company employees and by company human resource personnel. Printpack also claims that it has not violated § 8(a)(5) because it has never refused to meet or bargain with Hancock and because Hancock has been present at all of the recent collective bargaining sessions.

In *Frontier Hotel & Casino,* the Board found that the employer's refusal to allow union representatives who were not employees on company grounds to address griev-

ances, collect dues, and engage in a membership drive violated § 8(a)(5) of the Act. 309 NLRB 761, 764, 766, 1992 WL 372303 (1992). The employer in *Frontier Hotel* had consistently ordered union representatives off company property on "flimsy grounds." *Id.* at 764. The NLRB explained:

> To the extent that [the company] deprived employees of their contractually granted access to their bargaining representative, it was a unilateral change of a material term or condition of employment and therefore a breach of Section 8(a)(5); it likewise tended to interfere [with] the representational process, also a breach of Section 8(a)(5).

309 NLRB at 766, citing *Boyer Brothers, Inc.*, 217 NLRB 342, 1975 WL 20998 (1975); *Precision Anodizing & Plating*, 244 NLRB 846, 1979 WL 9878 (1979); and *Westinghouse Electric Corp.*, 243 NLRB 306, 1979 WL 9261 (1979). In this case, the Director presented evidence that Printpack and Local 761–S had a similar provision in their contract that granted international representatives (*i.e.*, union representatives who were not employees) access to the plant. ALJ Hearing Transcript at 231. The only reason that Hancock was denied access to the facility was the fact that he had been fired for sending his letter to Printpack's customers. There is a substantial likelihood that the Board will find that Printpack's denial of access to Hancock to the plant to participate in grievance procedures violated this provision in the contract and § 8(a)(5) of the NLRA for the same reasons set forth in *Frontier Hotel.*

### B. *The Equities*

 In addition to demonstrating some likelihood of success on the merits of the relevant unfair labor practice charges, the Director must show that the labor effort would probably be irreparably harmed absent the injunction and that the irreparable harm to the labor effort in the absence of an injunction would outweigh any irreparable harm to the employer. *Electro–Voice*, 83 F.3d at 1567, citing *Roland Machinery Co.*, 749 F.2d at 386–87. The Director also must show that public harm would result absent the injunction and that there is no adequate remedy at law. *Id.* A court should evaluate

the equities "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller v. California Pacific Medical Center*, 19 F.3d 449, 459–60 (9th Cir.1994).

 One issue should be addressed at the outset. In determining the propriety of injunctive relief under § 10(j), the court must consider whether "public harm" would result absent the injunction. See *Electro–Voice*, 83 F.3d at 1567. Printpack argues that the Board did not offer a single example of how "the public"—as opposed to employees and the union—would be harmed in the absence of injunctive relief. The Director need not show such harm to third parties. *Electro–Voice* makes clear that "public harm" occurs when the remedial purpose of the NLRA is undermined, and that proof beyond a showing of harm to the remedial purpose is unnecessary. *Id.* at 1574. The court "must weigh the potential public benefits against the potential public costs." *Id.* at 1574. The public benefit or interest is furthered when the provisions of the NLRA are enforced. In a § 10(j) case, "the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Miller*, 19 F.3d at 460. The public interest is harmed when the Board's remedial powers under the NLRA lose their effectiveness with the passage of time. The court will consider the equitable factors as to each of the Director's claims for relief.

### 1. *Balance of Equities on Hancock's Firing*

 The Director argues that unless an injunction issues under § 10(j), Local 761–S and its members will suffer irreparable harm from the chilling effect of Printpack's actions on the union's labor effort. Printpack argues that Local 761–S has suffered and will suffer no harm as a result of Hancock's termination. Printpack argues that its employees' rights have not been chilled, and it points to the fact that on June 20, 1997, Local 761–S's bargaining unit went on strike and remains

on strike. Although Printpack's argument has some appeal, the current solidarity of the strikers is not sufficient to overcome the chilling effect of Printpack's actions.

After Hancock's discharge, Local 761–S and its members were deterred from sending out additional letters to Printpack customers asking for their support before and during the strike. No letters from Local 761–S have been sent to Printpack's customers after Hancock's discharge. Yet that is a right that employees have under § 7, and it can be a vital tool for employees seeking support from third parties in an economic struggle with their employer. The Ninth Circuit has said: "If unions are not permitted to address matters that are of direct interest to third parties in addition to complaining about their own working conditions, it is unlikely that workers' undisputed right to make third party appeals in pursuit of better working conditions would be anything but an empty provision." *Sierra Publishing*, 889 F.2d at 217. After Hancock was fired for writing his letter the International Union sent a similar letter to Printpack customers informing them of the labor dispute. But that fact does not justify the continued violation of the rights of the members of Local 761–S. It is reasonable to expect that a letter from and on behalf of a company's own employees may carry more weight than a similar letter from distant officials of the international union. And Printpack's powerful response to the Hancock letter understandably intimidates other local union members from criticizing their employer.

The union and its members have seen their most visible and powerful advocate punished for representing them. Tom McKinney, Secretary–Treasurer of Local 761–S, testified credibly that he was afraid to ask members to pay dues because Printpack had fired Hancock for writing the letter to customers. Hancock and Ron Trepanier, a Local 761–S Vice President, echoed McKinney's concerns. In addition, even though Hancock still participates in contract negotiating sessions, he cannot enter the Printpack facility to process employee grievances, a process that continues during the strike. McKinney's testimony showed that union members have great confidence in Hancock as their elected representative. Employees prefer to take their complaints to Hancock, bypassing their union stewards and department vice-presidents to such a degree that the union has had to instruct its members to go first to the stewards or the vice-presidents with their concerns.

For purposes of § 10(j), it is also vital to keep in mind the importance of timely exercise of employees' rights to seek support from third parties, especially during a strike. In cases involving infringement of political speech, particularly during election campaigns, courts routinely assume and find that delay in the exercise of free speech rights causes irreparable harm. The same considerations apply here, where Printpack has threatened the ability of employees to seek help from third parties at the critical time of a strike. The Seventh Circuit emphasized in *Electro–Voice* the need for district courts to consider the passage of time in the balance of harm analysis. The court's words are particularly relevant here, where the employer has fired the local union president at a critical time in relations between a new employer and the union:

> The district court's conclusion turns a blind eye to the effect of the passage of time. As this case demonstrates, years may pass before the Board reaches the merits of a case. As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. The "dischargees" will seek, and obtain, new employment. Their search may require them to move, or may lead them to a preferable job. *Meanwhile, the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them. The union's position in the plant may deteriorate to the point that effective organization and representation is no longer possible.* As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from … the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is di-

minished with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process. For the same reasons we conclude that there is no adequate remedy at law.

83 F.3d at 1573 (citation omitted; emphasis added).

While Hancock currently is committed to the strike and Local 761–S, there is no guarantee that he can continue in that capacity during the time that it will take the Board to consider the unfair labor practice charges. Hancock's term as Local 761–S's president will expire in December 1997, and his termination from Printpack may affect his ability to be re-elected and serve Local 761–S in the capacity to which its members are accustomed. Although Hancock received a hardship loan from Local 761–S roughly equivalent to his weekly wages after his discharge and now receives "sacrificed member" benefits during the strike, Hancock may be forced to find other employment as the Board proceedings continue. The termination of the union president diminishes the effectiveness of Local 761–S in its organizing and bargaining activities at Printpack, thereby depriving employees of their rights under the NLRA.

In addition, the strike itself places Local 761–S in a precarious position. The strike is a powerful exercise of employees' § 7 rights, but a union is extremely vulnerable during a strike. The majority of its members are not working. The financial resources of the union are stretched as strike benefits are paid. In the wake of Printpack's response to Hancock's letter, the union and its other officers and members must act under the fear of reprisal for acts that are legal under the NLRA. That unlawful disruption of the balance of economic power between the employer and its employees causes irreparable harm that cannot be adequately remedied by enforcement of a Board decision a year or two or three from now.

Nevertheless, Printpack contends that relief under § 10(j) is not warranted because it has fired only one employee. There is no safe harbor under § 10(j) that allows an employer to fire one employee with (temporary) impunity. This case is not like *P\*I\*E Nationwide* where only one employee had been discharged after filing an unfair labor practice charge against his employer. 878 F.2d at 208–09. The Seventh Circuit based its decision in *P\*I\*E Nationwide* on the lack of evidence of chilling effects on other employees, and the fact that other employees were aware of the situation only because the fired employee had told them about it. *Id.* at 210. In this case, however, Printpack has fired in a very public way the most important and visible union representative, the local president.

The Seventh Circuit in *Electro–Voice* recognized the importance of particular employees to the union effort and employee morale. In reversing the denial of relief under § 10(j), the court pointed out: "The persons ... most active and most successful in organizing employees have been removed from the work place," and their "absence deprives the employees of the leadership they once enjoyed." *Electro–Voice,* 83 F.3d at 1573. Printpack's action in firing Hancock cannot be viewed as the simple discharge of a single employee. It was a dramatic public, and powerful attack against union activities. Printpack fired Hancock for protected acts that he performed as the union president. His letter resulted in a response by Printpack to all employees that such behavior "jeopardizes the jobs of everyone employed at Greensburg." Printpack's response has had a significant chilling effect on the members of Local 761–S despite the fact that they have gone on strike and currently remain on strike.

On the other side of the scales, Printpack will not be irreparably harmed by reinstating Hancock. Although Printpack argues that its customers will be outraged if Hancock is reinstated, Printpack has presented no evidence that its customers were outraged or even mildly distressed by receiving Hancock's letter, let alone that they would be outraged by a court-ordered reinstatement. Printpack also has presented no evidence to the court or to the ALJ that would link Hancock's letter or the union with the alleged acts of sabotage at the Printpack facility. Finally, Hancock committed no misconduct in the performance of his actual job-related duties for Printpack. The harm to

Local 761–S by the loss of employment of its president outweighs any harm that may arise by Printpack's reinstatement of Hancock. For all these reasons, the Director has shown a substantial likelihood of prevailing on this claim, as well as a threat of irreparable harm and "public harm" within the meaning of *Electro–Voice*. The balance of harms tips decidedly in favor of injunctive relief reinstating Hancock, and the court will order that relief.

The fact that Hancock's union is on strike adds an unusual twist to the issue of his reinstatement. So long as the strike continues, an order from this court will not put Hancock back to work for Printpack. But an order from this court will remove Printpack's punitive response to his lawful act of sending his letter and should tend to ease the chilling effect of that response on other employees, which is the most significant and irreparable effect of Hancock's firing. The court will order Printpack to rescind Hancock's discharge and to treat Hancock the same way it treats other striking employees.

2. *The Balance of Equities on the Printpack Lawsuit*

■ The Printpack lawsuit causes irreparable harm to the union and Hancock because it contributes to the punitive and intimidating effect of Printpack's response to the Hancock letter. The intimidating, *in terrorem* effect of the lawsuit on the union and Hancock is a reality today, in the midst of the labor dispute and strike. The cost of defending the lawsuit has not been shown to cause irreparable harm to the union or Hancock. The deterrent, *in terrorem* effect of the lawsuit is the irreparable effect.

Printpack argues that an injunction requiring it to stay prosecution of its § 303 action would cause it irreparable harm by depriving it of an adequate remedy at law for the union's actions and would violate the holding of *Bill Johnson's Restaurants*.

Printpack cannot recover monetary damages from the Board; it can seek damages only in the § 303 action. Printpack's claim of irreparable harm is diluted by the temporary nature of a stay of its lawsuit that seeks only money damages. The damage to Printpack claimed in its lawsuit occurred several months ago and is not ongoing. If the Board ultimately determines that Printpack's lawsuit is not baseless and is not a violation of § 8(a)(1) of the NLRA, Printpack will then be free to pursue the suit and might then recover damages. The court recognizes that a stay may remain in effect for some time while the Board resolves the unfair labor practice charge. Such delays can and do cause harm to litigants. However, such delays are common in many situations. Some examples that come readily to mind are lawsuits stayed by bankruptcy proceedings, many federal civil rights lawsuits stayed pending the outcome of criminal proceedings in state court, as well as some declaratory judgment actions and cases where federal courts abstain in deference to other court or administrative proceedings. Such delays are necessary to promote other values in federal law. In this case the delay will give the Board the opportunity to decide in the first instance the most critical question under the NLRA—whether Hancock's letter was protected activity. The answer to that question dominates Printpack's claims in its lawsuit under § 303. Any threatened harm to Printpack by staying the lawsuit is outweighed by the harm Local 761–S would suffer if no injunction were issued.

Printpack's related argument based on *Bill Johnson's Restaurants* presents a closer question for which case law is sparse. In *Bill Johnson's Restaurants*, after announcing the standard for determining when a state court lawsuit may be found an unfair labor practice, the Supreme Court addressed the problem presented by simultaneous proceedings in court and before the Board:

> Although the Board's reasonable-basis inquiry need not be limited to the bare pleadings, if there is a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts, it cannot, in our view, be concluded that the suit should be enjoined. When a suit presents genuine factual issues, the state plaintiff's First Amendment interest in petitioning the state court for redress of his grievance, his interest in having the factual dispute

resolved by a jury, and the State's interest in protecting the health and welfare of its citizens, lead us to construe the Act as not permitting the Board to usurp the traditional fact-finding function of the state-court jury or judge. Hence, we conclude that if a state plaintiff is able to present the Board with evidence that shows his lawsuit raises genuine issues of material fact, the Board should proceed no further with the § 8(a)(1)–§ 8(a)(4) unfair labor practice proceedings but should stay those proceedings until the state-court suit has been concluded.

461 U.S. at 744–46, 103 S.Ct. at 2170–72 (footnotes omitted). Printpack argues that the same principles apply to its § 303 lawsuit and require that it be allowed to proceed (and, in Printpack's counterclaim, that the Board be ordered to stay its unfair labor practice proceeding).

■ The rule announced in *Bill Johnson's Restaurants* for state lawsuits does not apply to this case because Printpack's lawsuit under § 303 is dominated by a question of federal labor law as to which the Board should exercise primary jurisdiction. Whether Hancock's letter to Printpack's customers was a protected appeal for the support of third parties or was instead an unlawful attempt to coerce and threaten customers is first and foremost a question of federal labor law. Because Indiana law requires proof of illegal conduct as an element of a claim for tortious interference with business relations, Printpack's claim for tortious interference is also dominated by the same federal labor law issue. As reflected in the quoted passage from *Bill Johnson's Restaurants*, the Supreme Court crafted the ruling in that case to protect the state's interest in protecting the health and welfare of its citizens, as well as the state court plaintiff's interest in having a jury find disputed facts. Those interests have little force in this case. Although district courts have jurisdiction over § 303 lawsuits and Printpack's claims are properly cognizable in court, its claims de-

pend on issues within the special competence of an administrative agency—the Board. Under the doctrine of primary jurisdiction, a court has the discretion to stay its proceedings to give the agency the opportunity to: decide the questions within its expertise. See, *e.g., Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 83, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982) (Board vested with primary jurisdiction to determine what is or is not an unfair labor practice under NLRA); *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993) (under the primary jurisdiction doctrine, courts may give parties reasonable opportunities to seek an administrative ruling before further court proceedings); *Nelson v. International Brotherhood of Electrical Workers, Local 46,* 899 F.2d 1557, 1563–64 (9th Cir.1990) (relying on primary jurisdiction doctrine to uphold § 10(*l*) injunction against union's suit under § 301 of LMRA).

Neither the Director nor Printpack has cited any cases considering this problem under § 10(j), but the Ninth Circuit's decision in *Nelson v. International Brotherhood* is closely analogous and persuasive. *Nelson* involved an injunction under § 10(*l*), which authorizes injunctive relief against certain classes of unfair labor practices by unions pending final adjudication by the Board.[3] See 29 U.S.C. § 160(*l*). The Board in *Nelson* sought and obtained an injunction ordering a union to stay prosecution of a pending federal lawsuit under § 301 of the LMRA to enforce an arbitration award. The Board argued that enforcement of the arbitration award would cause a violation of § 8(e) of the NLRA, which prohibits a class of secondary agreements in which an employer agrees to cease doing business with other persons. See 29 U.S.C. § 158(e).

Relying on the rule announced in *Bill Johnson's Restaurants,* the union argued that the § 301 lawsuit should go forward and that Board proceedings should be stayed. The Ninth Circuit disagreed, relying on the

---

**3.** A § 10(*l*) petition for injunction is similar to a § 10(j) petition but applies to unfair labor practice charges under §§ 8(b)(4), 8(e) and 8(b)(7). The significant difference between § 10(*l*) and § 10(j) petitions is that the Regional Director

*must* seek injunctive relief under § 10(*l*) if there is "reasonable cause to believe" that there has been a § 8(b)(4) violation. 29 U.S.C. § 160(*l*). Whether to seek relief under § 10(j) is left to the Board's discretion.

principle of primary jurisdiction. 899 F.2d at 1563–64. The court explained:

> We consider several factors in determining which forum should exercise primary jurisdiction where such concurrent jurisdiction exists. Generally, the district court has primary jurisdiction under section 301 over labor disputes involving primarily a question of contract interpretation, *IBEW Local 532 v. Brink Construction Co.*, 825 F.2d 207, 213–14 (9th Cir.1987). The NLRB has primary jurisdiction to construe the Act and "determine what is or is not an unfair labor practice." *Kaiser Steel*, 455 U.S. at 83, 102 S.Ct. at 859. This division of responsibility is due primarily to the judiciary's historical deference to specialized agencies in complex policy matters under the agencies' purview. In *Burke v. French Equipment Rental, Inc.*, 687 F.2d 307 (9th Cir.1982), we declined to hold that the district court should entertain a section 8(e) defense in a section 301 proceeding where, in a parallel proceeding, the NLRB had twice dismissed section 8(e) allegations. We reasoned:

> > The desire to protect the primary jurisdiction of the NLRB flows from the need to maintain centralized administration of the NLRA by a specialized agency. Labor law involves many difficult questions of policy best left to the agency that has the expertise needed to solve them.

687 F.2d at 311.

These factors weigh in favor of upholding the primary jurisdiction of the NLRB in this case. First, both proceedings involve the CIR award, and the issue in the Section 301 action—whether to enforce or vacate the CIR award—turns on the validity of the award under section 8(e). Therefore, the issues in the two actions are inextricably linked. Second, it is likely that the NLRB's decision in the section 8(e) action would be issue-preclusive in the section 301 action. Third, the initial investigative finding of the NLRB directly contradicts the ruling of the CIR, so there is a strong likelihood of a conflict between the ultimate NLRB ruling and the arbitral award. Finally, by restoring the Chapter's ability to provide its services to its non-union members, the injunction preserves the status quo.

The district court did not abuse its discretion in staying the section 301 action. *Id.* at 1564.

The same reasoning applies here. Both the unfair labor practice charges and the § 303 lawsuit are dominated by the same factual and federal legal questions under statutes that the Board is primarily responsible for enforcing and interpreting. The Board's decision in its proceedings could be issue-preclusive in the § 303 lawsuit. And the Board's initial investigative findings and the record before the ALJ show a substantial likelihood that Printpack will not prevail in its case and a reasonable likelihood that its lawsuit will ultimately be found to lack a reasonable basis in fact. Accordingly, the rule stated in *Bill Johnson's Restaurants* does not apply to this situation dominated by federal labor law issues as to which the Board should exercise primary jurisdiction. Printpack will not suffer irreparable harm from a stay of its lawsuit sufficient to outweigh the harm to the union and its members.

### 3. *The Balance of Equities on Barring Hancock from the Factory*

 The Director also seeks an injunction ordering Printpack to allow Hancock access to the Printpack facility for the purpose of representing union members. The balance of harms on this issue weighs decidedly in favor of the Director. Denying the union members their choice of representatives is a significant infringement of their rights under § 7 of the NLRA, and it is an infringement that can reasonably be expected over time to disrupt the local union internally. Such effects would be irreparable; they certainly could not be cured by enforcement of a Board order two or three years from now. Allowing Hancock to enter the facility will cause no appreciable harm, let alone irreparable harm, to Printpack. The Director is entitled to injunctive relief on this claim, as well as on the first two.

## II. *Printpack's Counterclaims*

Printpack has asserted four counterclaims and seeks preliminary injunctive relief under each of them. First, Printpack contends that by pursuing an unfair labor practice case against it for having filed its lawsuit against the union and Hancock under § 303, the Board is violating Printpack's rights under § 303 of the LMRA. Second, Printpack contends that the same action by the Board violates its First Amendment right to petition the courts for relief. Third, Printpack contends that the Board is violating the NLRA by pursuing an unfair labor practice charge for having stopped deducting and collecting union dues from employees' paychecks after the expiration of the collective bargaining agreement. Fourth, Printpack contends that the Board is violating its due process and statutory rights in the way that the Board reviews and acts upon requests by its General Counsel for approval to pursue injunctive relief under § 10(j).

■■■ Printpack has moved for a preliminary injunction on its counterclaims. The court heard Printpack's motion for preliminary injunction at the same time it heard the Board's § 10(j) petition. The Board has responded to Printpack's motion for preliminary injunction by moving to dismiss all counterclaims for lack of subject matter jurisdiction. Printpack anticipated the Board's jurisdictional arguments and has addressed them in its own motion papers. The general rule is that district courts do not have subject matter jurisdiction to entertain requests for injunctions against Board proceedings. See 29 U.S.C. § 160(e) & (f) (providing for exclusive jurisdiction in courts of appeal for judicial review of Board actions), and *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48, 58 S.Ct. 459, 462, 82 L.Ed. 638 (1938). Printpack acknowledges that general rule but argues that its counterclaims are subject to the exceptions to that general rule as set forth in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), for Board actions that plainly violate the governing statute, and in *Fay v. Douds*, 172 F.2d 720 (2d Cir.1949), for actions that plainly violate the Constitution. At the hearing on the motion for preliminary injunction, the court heard oral argument from both sides on these issues and allowed for further briefing. Accordingly, the jurisdictional issues have been aired sufficiently to be resolved at this time. As explained below, this court lacks subject matter jurisdiction over all four of Printpack's counterclaims, so preliminary injunctive relief must be denied and the counterclaims must be dismissed for lack of subject matter jurisdiction.

Earlier this year, in a case with remarkable similarities to this one, the Seventh Circuit restated the principles governing the narrow extent of a district court's power to enjoin Board proceedings:

> It is well settled that a district court has no jurisdiction to enjoin unfair labor practice hearings before the NLRB. 29 U.S.C. [§ ]160(e), (f); *see Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 48, 58 S.Ct. 459, 462, 82 L.Ed. 638 (1938); *Vapor Blast Mfg. Co. v. Madden*, 280 F.2d 205, 208–09 (7th Cir.), *cert. denied*, 364 U.S. 910, 81 S.Ct. 273, 5 L.Ed.2d 225 (1960). Generally, a party seeking to challenge NLRB proceedings must first exhaust its administrative remedies, and then may petition for review only before the court of appeals.

*Zipp v. Geske & Sons, Inc.*, 103 F.3d 1379, 1382–83 (7th Cir.1997) (footnote omitted). In *Zipp v. Geske & Sons*, the defendant employer had filed a lawsuit for libel in state court against a union that was picketing the employer to seek recognition as the union representing the employees. The union filed an unfair labor practice charge with the Board claiming that the state court lawsuit was baseless and amounted to an unfair labor practice in violation of § 8(a) of the NLRA. The Board filed a complaint against the employer and an ALJ conducted a hearing on the complaint. The Board also sought injunctive relief in a district court under § 10(j) to enjoin the employer from prosecuting the state lawsuit while the Board's unfair labor practice proceeding went forward. The employer filed a counterclaim alleging that the Board's pursuit of the unfair labor practice violated the employer's First Amendment right to petition the courts for redress of grievances.

The district court held that it had no jurisdiction to enjoin an unfair labor practice proceeding and that the employer could seek vindication of its asserted rights through judicial review of the Board's final decision in the unfair labor practice proceeding. The Seventh Circuit agreed:

It is true that there exists a narrow "statutory authority" exception to the usual jurisdictional requirement of exhaustion of administrative remedies. *See Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 183–84, 3 L.Ed.2d 210 (1958); *Abercrombie v. Office of the Comptroller of Currency,* 833 F.2d 672, 675 (7th Cir.1987). This exception allows a district court to enjoin agency action in cases in which the agency has exceeded a "plain and unambiguous statutory command or prohibition ... in circumstances where no adequate alternative judicial remedy exists." *Abercrombie,* 833 F.2d at 675. Similarly, a district court may enjoin agency action that amounts to a "plain violation" of a constitutional right. *Squillacote v. International Bhd. of Teamsters, Local 344,* 561 F.2d 31, 39 (7th Cir. 1977). A plain violation is one in which a provision of a statute is unconstitutional on its face. *Grutka v. Barbour,* 549 F.2d 5, 8 (7th Cir.), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977).

103 F.3d at 1383 (footnote omitted). The Seventh Circuit went on to hold that the Board has both the statutory and constitutional power to treat the prosecution of a baseless lawsuit as an unfair labor practice. *Id.* The Seventh Circuit made a point of rejecting the employer's argument that, because the employer merely contended the state court lawsuit was not baseless, the district court had jurisdiction to issue an injunction against the Board's proceeding. Even if the Board turned out to be wrong about the merits of the employer's lawsuit, "that error would not amount to a 'plain violation' of the Constitution so as to confer jurisdiction on the district court." *Id.* at n. 7. citing *Boire v. Greyhound Corp.,* 376 U.S. 473, 481, 84 S.Ct. 894, 898–99, 11 L.Ed.2d 849 (1964). *Zipp v. Geske & Sons* shows that the *Leedom v. Kyne* exception is very narrow, applicable only in situations that involve crystal clear violations of a statute or the Constitution,

and where no adequate alternative remedy is available. Without those narrow limits—if a party could establish jurisdiction in the district courts by merely asserting that the Board's complaint was based on a mistake of fact or law—the exception would quickly swallow the rule that forbids district courts from enjoining unfair labor practice proceedings before the Board.

 Printpack's first two counterclaims fall squarely within the reasoning of *Zipp v. Geske & Sons.* Printpack's argument that its § 303 lawsuit is not actually baseless is not sufficient to confer jurisdiction on this court to enjoin the unfair labor practice proceeding. Printpack correctly points out that § 303 gives it a statutory right to file a lawsuit in a district court to recover money damages from a union's unlawful secondary activity. And Printpack is free to file such an action without first presenting the matter to the Board. Printpack points out that its statutory right to seek relief under § 303 does not depend on the Board filing an unfair labor practice charge against the union under § 8(b)(4). See *International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp.,* 342 U.S. 237, 243–44, 72 S.Ct. 235, 239–40, 96 L.Ed. 275 (1952). But neither the First Amendment nor § 303 nor *Juneau Spruce* gives Printpack or any other employer the right to file and prosecute a *baseless* lawsuit under § 303. Is the lawsuit baseless? The parties debate whether that question should be answered first by the Board or by the district court in the § 303 case. But it certainly should not be decided by this court in this action.

To support its request for preliminary injunctive relief, Printpack also points to the Supreme Court's instruction in *Bill Johnson's Restaurants* to the effect that the NLRB should ordinarily stay its unfair labor practice proceeding challenging the prosecution of a state court lawsuit as an unfair labor practice and should await the outcome of the employer's lawsuit in the court where it is pending. See 461 U.S. at 744–46, 748–49, 103 S.Ct. at 2170–72, 2172–73. As discussed above in connection with the Director's request for § 10(j) relief, the rule of *Bill Johnson's Restaurants* does not apply to this case

where the controversy is dominated by issues of federal labor law as to which the Board can and should exercise primary jurisdiction.

Printpack acknowledges that *Bill Johnson's Restaurants* holds that the NLRB does not violate the First Amendment rights of an employer when it seeks to prevent the prosecution of a baseless and retaliatory state lawsuit in state court. See 461 U.S. at 743, 103 S.Ct. at 2170. Yet Printpack makes the curious assertion that the Supreme Court's holding does not extend to this case because the lawsuit in question is a federal lawsuit for monetary damages under § 303 that has already withstood a motion to dismiss. Printpack Br. in Support of Motion for Prelim. Inj. at 14. The logic of the argument is that, so long as Printpack can file a complaint sufficient to beat a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it has a First Amendment right to bring a factually baseless and retaliatory lawsuit under a federal statute. That is obviously wrong as a matter of constitutional law. A motion under Rule 12(b)(6) requires a court to accept as true all factual allegations in a complaint, and even factual assertions made in a brief in opposition to the motion, so long as they are consistent with the complaint, see *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 78–79 (7th Cir.1992). The ability to defeat such a motion does not determine whether a lawsuit is baseless and retaliatory. Federal courts routinely dismiss frivolous and baseless lawsuits attempting to invoke federal law, and they sometimes impose sanctions on litigants and lawyers for having brought and pursued such actions. Such dismissals and sanctions do not violate the First Amendment. Printpack's attempt to limit the reasoning of *Bill Johnson's Restaurants* is unavailing.

Regardless of whether Printpack is ultimately right or wrong on the merits of its lawsuit under § 303 and on the question whether the Board or the district court should go first, its request for an injunction to stop the Board's unfair labor practice proceeding does not satisfy either prong of the narrow *Leedom v. Kyne* exception that might create jurisdiction here. The Board's unfair labor practice charge against the § 303 law-suit and its attempt to use § 10(j) against the § 303 lawsuit have persuaded this court that § 10(j) relief is warranted. The Board's actions are not a "plain" violation of any statute or constitutional provision that could give this court jurisdiction to enjoin the Board's proceeding. See *Zipp v. Geske & Sons*, 103 F.3d at 1383 & nn. 6–7. To the extent that the underlying unfair labor practice charge might interfere with Printpack's rights, its ability to seek judicial review of any final Board action in the Court of Appeals provides an adequate avenue for judicial relief. To the extent that Printpack claims this § 10(j) proceeding violates its rights, an appeal from this court's decision provides Printpack with an adequate avenue for judicial relief. See *id.* at 1384.

■ Printpack's third counterclaim asks this court to enjoin the Board from pursuing a portion of the unfair labor practices proceeding based on Printpack's decision to stop withholding union dues from employees' paychecks after termination of the previous collective bargaining agreement. Printpack asserts that this effort by the Board violates § 10(f) of the NLRA because the Board is refusing to follow binding precedent from the Supreme Court and the Seventh Circuit. Printpack relies on the Supreme Court's opinion in *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). In that opinion, the Supreme Court referred to "the Board's view that union security and dues check-off provisions are excluded from the unilateral change doctrine because of statutory provisions which permit these obligations only when specified by the express terms of a collective-bargaining agreement." 501 U.S. at 199, 111 S.Ct. at 2221, citing 29 U.S.C. §§ 158(a)(3) & 186(c)(4). and *Indiana & Michigan Elec. Co.*, 284 NLRB 53, 55, 1987 WL 89684 (1987), which in turn quoted *Bethlehem Steel*, 136 NLRB 1500, 1502 (1962). This comment in the Court's opinion hardly reflects binding precedent from the Supreme Court to the effect that a contrary view of dues check-off arrangements after termination of a collective bargaining agreement after impasse in negotiations is obviously and necessarily wrong. The Seventh Circuit opinion cited by Printpack, *United States Can Co. v. NLRB,*

984 F.2d 864, 869 (7th Cir.1993), also referred to the same Board precedent and an interpretation of 29 U.S.C. § 186(c)(4). (It is not clear that Judge Will joined in that particular portion of Judge Easterbrook's argument, and Judge Cudahy did not join it. *Id.* at 871–72 and 874.) The two courts' observations about the Board's views do not establish binding precedents on this question. Also relevant here is the well-established doctrine that the Board is entitled to change its mind on questions of interpretation of the statutes it administers. *E.g., NLRB v. Action Automotive, Inc.,* 469 U.S. 490, 495 n. 4, 105 S.Ct. 984, 988 n. 4, 83 L.Ed.2d 986 (1985). Those changes are subject to review in the courts of appeals, of course, but if the Board changes its collective mind and seeks to persuade the courts of appeals that its new view is correct, it may do so without giving the district courts jurisdiction to enjoin the proceedings in which it considers the question. Neither prong of the *Leedom v. Kyne* exception is satisfied as to the third counterclaim. The General Counsel's position on the dues check-off issue is not plainly wrong, see Board's Brief in Support of Motion to Dismiss Counterclaims at 21 n. 9, and Printpack has adequate judicial remedies available through judicial review of a final Board order.

■ Printpack's fourth counterclaim challenges the internal operating procedures by which the Board authorizes its General Counsel to seek injunctive relief under § 10(j). Section 10(j) requires the Board itself, without delegating the decision, to decide whether to petition a district court for injunctive relief. According to the NLRB's Manual on Section 10(j) Injunctions, the process begins when a regional director submits a written recommendation to the General Counsel setting forth the relevant facts and law. The General Counsel then reviews the recommendation and makes his or her own recommendation to the individual members of the Board. That recommendation includes the General Counsel's own analysis of the facts and law. General Counsel's Response to Printpack's First Request for Admissions, No. 4. Next, the Board members consider the General Counsel's recommendation and supporting materials, and a majority · of the

Board may authorize the Regional Director to file the § 10(j) petition. See *National Labor Relations Board's Internal Manual on Section 10(j) Injunctions [portions withheld under the Freedom of Information Act],* BNA Special Supplement, Aug. 5, 1994, at S–3 through S–16.

Printpack argues that the role of the General Counsel in this process violates constitutional, due process and Administrative Procedure Act ("APA") prohibitions on substantive *ex parte* communications between an administrative adjudicator and a party to the proceeding. Printpack relies on *Doe v. Hampton,* 566 F.2d 265, 276 (D.C.Cir.1977) ("as a general rule, ex parte communications by an adversary party to a decision-maker in an adjudicatory proceeding are prohibited as fundamentally at variance with our conceptions of due process"), and 5 U.S.C. § 554(d) (agency employee engaged in prosecutorial functions may not give *ex parte* advice in case, but exception is made for members of the agency's governing body). In the underlying unfair labor practice proceeding here, the Board itself is the final administrative adjudicative body. The General Counsel and his staff act as prosecutors pursuing the complaint against Printpack. Printpack argues that the § 10(j) procedures require the General Counsel to give individual Board members a first, and *ex parte*, factual and legal presentation of the case long before the unfair labor practice proceeding would come before the Board for final administrative adjudication.

The Board's jurisdictional arguments on this counterclaim, like the other counterclaims, require the court to take a preliminary look at the merits of the claim to determine whether it asserts a sufficiently "plain" statutory or constitutional violation to invoke this court's jurisdiction under the doctrine of *Leedom v. Kyne.* The Board relies on *Kessel Food Markets, Inc. v. NLRB,* 868 F.2d 881, 887–88 (6th Cir.1989), *NLRB v. Sanford Home for Adults,* 669 F.2d 35, 37 (2d Cir. 1981), and *Eisenberg v. Holland Rantos Co.,* 583 F.2d 100 (3d Cir.1978), as well as the Supreme Court's decision in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

The decisions in *Kessel Food Markets, Sanford Home,* and *Holland Rantos* support the Board's argument that the mere fact that the Board has earlier reviewed a § 10(j) recommendation from the General Counsel in a case that later reaches the Board does not, without more, violate due process or the APA. But those decisions do not hold that there is no violation of due process or the APA by having the General Counsel submit a secret *ex parte* communication to the Board where that communication *remains secret* from the respondent in the unfair labor practice proceeding. The analogies relied-upon in *Kessel Food Markets* (868 F.2d at 887–88)—having the same judge in a criminal case issue an arrest warrant *ex parte* on a probable cause affidavit and then preside at trial; or having the same judge in a civil case issue a temporary restraining order on an *ex parte* basis and then preside at trial—are situations in which the early *ex parte* communications with the adjudicators are ordinarily available to the opponent *at a later time.* That disclosure at least gives the opponent an opportunity to rebut misstatements of fact or law. In *Withrow v. Larkin,* the Supreme Court held that due process does not always forbid the combination of investigative, prosecutorial, and adjudicative functions in administrative agencies. 421 U.S. at 52–55, 95 S.Ct. at 1467–69. However, the Court noted that the state agency in that case permitted the adverse party and his counsel to attend the non-adversarial investigative proceedings so that they knew what information had been presented to the agency. *Id.* at 54–55, 95 S.Ct. at 1468–69. Part of the relief sought by Printpack on this counterclaim would include disclosure of the General Counsel's § 10(j) recommendation to the Board members—*i.e.,* the disclosure of the challenged *ex parte* communication. The cases cited by the Board do not appear to control that specific issue and claim for relief.

Although Printpack's fourth counterclaim raises a substantial question on the merits, at least to the extent it seeks to compel disclosure of the *ex parte* communications, the court concludes that it lacks jurisdiction over this claim. A party does not satisfy the *Leedom v. Kyne* exception merely by raising a substantial constitutional or statutory claim. See *Zipp v. Geske & Sons,* 103 F.3d at 1383 n. 6. The first prong of the jurisdictional exception requires a "plain" violation. Because the second prong of the *Leedom v. Kyne* exception is decisive here, the court need not determine at this point whether *ex parte* communication that remains secret is such a plain violation of due process or the APA to permit this court to issue an injunction directing the Board to disclose the General Counsel's § 10(j) recommendation while the unfair labor practice is proceeding before the Board. Printpack has an adequate alternative judicial remedy. Discovery responses in this case show that such an *ex parte* communication did take place here. Printpack can raise this issue with the Board in the underlying unfair labor practice proceeding. At that time, the Board can consider and decide the issue.

Printpack argues that it cannot raise this issue before the Board because it has not raised the issue before the ALJ, and it could not raise the issue before the ALJ because the Board did not file its § 10(j) petition until after the end of the administrative hearing when the ALJ closed the record in the unfair labor practice proceeding. See ALJ Hearing Transcript at 499 (record closed on June 25, 1997). However, this court held its hearings before the parties filed their briefs with the ALJ, and at the hearing in this court, counsel for the Board pointed out that Printpack may still move to supplement the record and may raise the issue before the ALJ or the Board. The Regional Director has described the procedure under which Printpack may do so:

> Under § 102.24 of the Rules (29 C.F.R. § 102.24), subsequent to an unfair labor practice hearing but before the case is transferred to the Board, parties are entitled to file motions with the Administrative Law Judge. Under § 102.35 of the Rules (29 C.F.R. § 102.35), the Administrative Law Judge has the power "to dispose of ... motions [and] ... to order hearings reopened...." Printpack thus can file a motion with the Administrative Law Judge asking that the unfair labor practice case record be reopened to submit arguments and evidence of *ex parte* communications and alleged due process violations. Under

858

§ 102.26 of the Rules (29 C.F.R. § 102.26), there is no absolute right to take direct appeals to the Board of interlocutory orders, but parties may file a "request for special permission to appeal" from any ruling of an Administrative Law Judge, briefly stating "(1) the reasons special permission should be granted and (2) the grounds relied on for the appeal." Separately, under § 102.42 of the Board's Rules (29 C.F.R. § 102.42), "any party may ... file a brief or proposed findings and conclusions, or both, with the administrative law judge...." This section permits Printpack to file a brief with the Administrative Law Judge, in which it can raise arguments and defenses to the unfair labor practice allegations, including due process assertions. Under § 102.46 of the Rules (29 C.F.R. § 102.46), any party may file with the Board "exceptions to the administrative law judge's decision or to any other part of the record or proceedings (including rulings upon all motions or objections), together with a brief in support of said exceptions." Printpack thus will have the ability to appeal to the Board from the decision of the Administrative Law Judge, as well as prior rulings, including those relating to due process arguments.

Board's Supplemental Br. in Support of Motion to Dismiss Counterclaims at 5–6. This statement appears to be accurate, and in reliance upon it, the court concludes that Printpack is not barred from raising the *ex parte* communication issue before the Board. If the Board rejects Printpack's contention or refuses to consider it, that is an issue Printpack can raise on judicial review of a final Board order, which is precisely how the similar claims were raised in *Kessel Food Markets, Sanford Home,* and *Holland Rantos.* That avenue provides an adequate judicial remedy without resort to the *Leedom v. Kyne* jurisdictional exception. The availability of that remedy means that this court lacks subject matter jurisdiction over Printpack's fourth counterclaim.

### Conclusion

For the reasons set forth above, the court is today issuing an injunction pursuant to § 10(j) of the NLRA ordering defendant Printpack to: (1) reinstate Chris Hancock to his former position and to treat Hancock like any other employee who is currently on strike; (2) permit Hancock access to the Greensburg, Indiana, facility for the purpose of representing union members in grievance proceedings and other union-related matters (such as collective bargaining sessions) that take place on Printpack property; (3) file a motion in Cause No. IP 97–251–C requesting that the court stay proceedings in that case with respect to Counts 1 and 2 of Printpack's amended complaint pending final resolution of the unfair labor practice proceeding before the Board concerning the filing and prosecution of that lawsuit. The injunction shall take effect immediately. The court is also dismissing Printpack's counterclaims for lack of subject matter jurisdiction and denying its motion for preliminary injunction.

So ordered.